Stephen H.M. Bloch, #7813
David T. Garbett, *pro hac vice*
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah  84111
Phone:  (801) 428-3981
steve@suwa.org
david@suwa.org

Robert Wiygul, *pro hac vice*
1025 Division Street, Suite C
Biloxi, Mississippi  39530
Phone:  (228) 374-0700
robert@waltzerlaw.com

Robin Cooley, *pro hac vice*
Alison C. Flint, *pro hac vice*
Heidi J. McIntosh #6277
Earthjustice
1400 Glenarm Place, #300
Denver, Colorado  80202
Phone:  (303) 623-9466
rcooley@earthjustice.org
aflint@earthjustice.org
hmcintosh@earthjustice.org

Attorneys for Plaintiffs SOUTHERN UTAH WILDERNESS ALLIANCE *et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT UTAH, CENTRAL DIVISION

| | |
|---|---|
| Southern Utah Wilderness Alliance, *et al.*, ) | **PLAINTIFFS' OPENING BRIEF** |
| ) | **RICHFIELD RESOURCE** |
| Plaintiffs, ) | **MANAGEMENT PLAN** |
| ) | |
| v. ) | Consolidated Case |
| ) | No. 2:12cv257 DAK |
| Marcilynn Burke, *et al.,* ) | |
| ) | Honorable Dale A. Kimball |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| Enduring Resources*, et al.,* ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |
| ) | |
| Southern Utah Wilderness Alliance, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |

|  | ) |
| v. | ) |
|  | ) |
| United States Department of the Interior, | ) |
| *et al.,* | ) |
|  | ) |
| Defendants, | ) |
|  | ) |
| and | ) |
|  | ) |
| Kane County, Utah, *et al.,* | ) |
|  | ) |
| Defendant-Intervenors. | ) |

TABLE OF CONTENTS

BACKGROUND ..................................................................................................................1

STANDARD OF REVIEW ................................................................................................6

ARGUMENT .....................................................................................................................7

I.   BLM Failed to Follow Its Own "Minimization Criteria" Regulations in the Preparation of the Richfield RMP Travel Plan....................................................................7

    A.   BLM's Minimization Criteria Require BLM to Minimize the Impacts of Route Designations to Resources .......................................................................8

    B.   Rather Than Applying the Minimization Criteria Expressly Required by 43 C.F.R. Section 8342.1, BLM Applied a Less-Protective Standard ..................................10

    C.   The Richfield Route Designations Are Not Supported by the Evidence in the Administrative Record ..........................................................................................11

II.   BLM Violated NEPA by Failing to Take a "Hard Look" at the Full Impacts of Designating 4,277 Miles of Routes....................................................................................14

III.   BLM Violated the National Historic Preservation Act by Failing to Take Into Account the Impact of the Travel Plan on Archeological Resources.............................................17

    A.   The Richfield Planning Area Contains Significant, Irreplaceable Archaeological Resources That Are Being Damaged by OHVs....................................................17

    B.   The NHPA and Its Implementing Regulations Require BLM to Consider the Adverse Impacts of Its Undertakings on Archeological Resources.......................19

    C.   The Richfield Field Office's Travel Planning Decisions Violated the NHPA and BLM's Own Guidance ..........................................................................................21

        1.   BLM's "no adverse effects" determination violated the NHPA regulations and is contrary to evidence in the administrative record ........................................22

        2.   BLM violated the NHPA regulations by failing to undertake reasonable and good faith efforts to identify significant cultural resources within the Richfield planning area ..................................................................................................24

        3.   BLM failed to comply with its own guidance in IM 2007-030 ......................26

IV.   The Travel Plan Violates Secretarial Order 3226 and NEPA Because BLM Failed to Address the Impacts of OHV Use in the Context of Climate Change..............................27

i

A.  BLM Violated Secretarial Order 3226 by Failing to Analyze OHV and Climate Change Impacts..........................................................................................28

B.  BLM Violated NEPA by Failing to Take a Hard Look at OHV Impacts in the Context of Climate Change.................................................................................30

C.  BLM Cannot Rely on Uncertainty as an Excuse Not to Consider Available Information Regarding Climate Change.................................................................33

V.  The Richfield RMP Violates FLPMA Because It Does Not Ensure Compliance with Federal Air Quality Standards ...............................................................................34

A.  The Richfield Planning Area Is Likely Exceeding Federal Air Quality Standards for Ozone and Fine Particulates.............................................................35

B.  Activities Authorized by the RMP Will Contribute to the Existing Pollution Problems in the Richfield Planning Area................................................................37

C.  BLM Violated FLPMA by Failing to Demonstrate That the Richfield RMP Will Ensure Compliance with Federal and State Air Quality Standards for Fine Particulates and Ozone...........................................................................................38

VI.  BLM Violated FLPMA by Failing to Prioritize the Designation of Areas of Critical Environmental Concern ......................................................................................39

VII.  BLM Violated the Wild and Scenic Rivers Act by Eliminating Eligible River Segments Based on Their Ephemeral Flows ......................................................................45

A.  Wild & Scenic Rivers in the Richfield Planning Area .........................................45

B.  BLM's Eligibility Determination Violates the Wild and Scenic Rivers Act.........47

CONCLUSION...................................................................................................................50

TABLE OF AUTHORITIES

CASES

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*,
   462 U.S. 87 (1983) .................................................................................................14

*Center for Biological Diversity v. Bureau of Land Management*,
   422 F. Supp. 2d 1115 (N.D. Cal. 2006) ........................................................16, 30

*Center for Biological Diversity v. Bureau of Land Management*,
   746 F. Supp. 2d 1055 (N.D. Cal. 2009) ...........................................9, 12, 13, 15

*Center for Biological Diversity v. National Highway Traffic Safety Administration*,
   538 F.3d 1172 (9th Cir. 2008) ................................................................................32

*City of Albuquerque v. U.S. Department of Interior*,
   379 F.3d 901 (10th Cir. 2004) ................................................................................29

*Committee to Save Cleveland's Huletts v. U.S. Army Corps of Engineers*,
   163 F. Supp. 2d 776 (N.D. Ohio 2001) .................................................................21

*Conservation Law Foundation of New England v. Clark*,
   590 F. Supp. 1467 (D. Mass. 1984) ...............................................................8-9, 10

*CTIA-Wireless Association v. F.C.C.*,
   466 F.3d 105 (D.C. Cir. 2006) ...............................................................................20

*Defenders of Wildlife v. Salazar*,
   ---F. Supp. 2d---, 2012 WL 2812309 (M.D. Fla. July 10, 2012) .............................9

*Half Moon Bay Fishermans' Marketing Association v. Carlucci*,
   857 F.2d 505 (9th Cir. 1988) ................................................................................32

*Idaho Conservation League v. Guzman*,
   766 F. Supp. 2d 1056 (D. Idaho 2011) .......................................................9, 10, 13

*Immigration & Naturalization Service v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ...............................................................................................49

*Lamb v. Thompson*,
   265 F.3d 1038 (10th Cir. 2001) .............................................................................27

*Mid States Coalition for Progress v. Surface Transportation Board*,
   345 F.3d 520 (8th Cir. 2003) ...........................................................................33, 34

*Montana Environmental Information Center v. Bureau of Land Management*,
No. 9:08-cv-178, Order Denying Mot. to Dismiss (D. Mont. May 27, 2009)
(unpublished) ....................................................................................................... 28-29

*Montana Wilderness Association v. McAllister*,
666 F.3d 549 (9th Cir. 2011) ..................................................................................34

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ............................................................................. passim

*Muckleshoot Indian Tribe v. U.S. Forest Service*,
177 F.3d 800 (9th Cir. 1999) ..................................................................................19

*National Center for Preservation Law v. Landrieu*,
496 F. Supp. 716 (D.S.C. 1980)..............................................................................20

*National Trust for Historic Preservation v. U.S. Army Corps of Engineers*,
552 F. Supp. 784 (S.D. Ohio 1982) ........................................................................20

*Natural Resources Defense Council v. Kempthorne*,
506 F. Supp. 2d 322 (E.D. Cal. 2007).....................................................................33

*New Mexico ex rel. Richardson v. Bureau of Land Management*,
565 F.3d 683 (10th Cir. 2009) ................................................................................16

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004)..................................................................................................34

*Oregon Natural Resources Council Fund v. Brong*,
492 F.3d 1120 (9th Cir. 2007) ..........................................................................32, 33

*Pueblo of Sandia v. United States*,
50 F.3d 856 (10th Cir. 1995) ............................................................................19, 24

*Qwest Corp. v. F.C.C.*,
689 F.3d 1214 (10th Cir. 2012) ..............................................................................49

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)...........................................................................................14, 30

*Rocky Mountain Wild v. Vilsack*,
843 F. Supp. 2d 1188 (D. Colo. 2012).....................................................................27

*Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*,
481 F.2d 1079 (D.C. Cir. 1973)...............................................................................33

*Sierra Club v. U.S. Forest Service,*
    857 F. Supp. 2d 1167 (D. Utah 2012) ............................................................. 12-13

*Utah Environmental Congress v. Richmond,*
    483 F.3d 1127 (10th Cir. 2007) ...................................................................37, 39

*Utah Shared Access Alliance v. Carpenter,*
    463 F.3d 1125 (10th Cir. 2006) ...............................................................................6

*Valley Community Preservation Commission v. Mineta,*
    373 F.3d 1078 (10th Cir. 2004) .............................................................................19

*Wilderness Society v. Bureau of Land Management,*
    822 F. Supp. 2d 933 (D. Ariz. 2011) ................................................................ 9-10

*Wildlands CPR, Inc. v. U.S. Forest Service,*
    ---F. Supp. 2d---, 2012 WL 1072351 (D. Mont. Apr. 2, 2012) ......................9, 10, 12

## STATUTES

5 U.S.C. § 706(2)(A) ...............................................................................................6

16 U.S.C. § 470(b) ...............................................................................................19

16 U.S.C. § 470-1 .................................................................................................19

16 U.S.C. § 470f ...............................................................................................7, 19

16 U.S.C. § 470w(7) .............................................................................................19

16 U.S.C. § 1271 .............................................................................................46, 47

16 U.S.C. § 1273(a) .............................................................................................46

16 U.S.C. § 1273(b) .....................................................................................7, 46, 47

16 U.S.C. § 1275(a) .............................................................................................46

16 U.S.C. § 1276(d)(1) .........................................................................................46

16 U.S.C. § 1283(a) .............................................................................................46

16 U.S.C. § 1286(b) .....................................................................................7, 47, 49

42 U.S.C. § 4332(2)(C) ...............................................................................3, 7, 14, 30

42 U.S.C. § 7408 ....................................................................................................35

42 U.S.C. § 7409 ....................................................................................................35

43 U.S.C. § 1702(a) ...............................................................................................40

43 U.S.C. § 1712(a) .................................................................................................1

43 U.S.C. § 1712(c) ...............................................................................................40

43 U.S.C. § 1712(c)(3) ..................................................................................2, 7, 39

43 U.S.C. § 1712(c)(8) .......................................................................................7, 34

43 U.S.C. § 1732(a) .....................................................................................2, 34, 40

Omnibus Oregon Wild and Scenic Rivers Act, Pub. L. No. 100-557, 102 Stat. 2782
(1988) ...............................................................................................................50

**EXECUTIVE ORDERS**

Exec. Order No. 11,644, 37 Fed. Reg. 2877 (Feb. 9, 1972) .................................8, 9

Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 25, 1977) .............................8, 9

Secretary of the Interior, Order No. 3226 (Jan. 19, 2001) ......................................28

**REGULATIONS**

36 C.F.R. § 800.3 ..................................................................................................27

36 C.F.R. § 800.3(a) ..............................................................................................20

36 C.F.R. § 800.4 ..................................................................................................27

36 C.F.R. § 800.4(a) ..............................................................................................20

36 C.F.R. § 800.4(b) ..................................................................................20, 22, 24

36 C.F.R. § 800.4(d) ..............................................................................................21

36 C.F.R. § 800.5 .............................................................................................22, 27

36 C.F.R. § 800.5(a) .......................................................................................21, 24, 27

36 C.F.R. § 800.5(b) .......................................................................................21, 22

36 C.F.R. § 800.5(d) ...................................................................................21, 24

36 C.F.R. § 800.6 ...............................................................................................21

36 C.F.R. § 800.16(i) .........................................................................................20

36 C.F.R. § 800.16(y) .........................................................................................20

40 C.F.R. § 50.13 .........................................................................................35, 36

40 C.F.R. § 50.15 ...................................................................................35, 36, 37

40 C.F.R. § 1502.1 .......................................................................................14, 30

40 C.F.R. § 1502.14 ...........................................................................................30

40 C.F.R. § 1502.15 .......................................................................14, 16, 30, 32

40 C.F.R. § 1502.16 .....................................................................................14, 30

40 C.F.R. § 1502.22 ...........................................................................................34

40 C.F.R. § 1502.22(b) .......................................................................................34

40 C.F.R. § 1508.7 .......................................................................................30, 32

40 C.F.R. § 1508.8 .......................................................................................14, 30

40 C.F.R. § 1508.25(b) .......................................................................................30

40 C.F.R. § 1508.25(c) .......................................................................................30

43 C.F.R. § 1601.0-5(b) .......................................................................................2

43 C.F.R. §1601.0-6 .............................................................................................3

43 C.F.R. § 1610.5-3(a) .....................................................................................34

43 C.F.R. § 1610.7-2(a) .....................................................................................40

43 C.F.R. § 8340.0-5(a) .......................................................................................1

43 C.F.R. §§ 8340-42 ...........................................................................................9

43 C.F.R. § 8342.1 .......................................................................................10, 13

43 C.F.R. § 8342.1(a)-(c)...........................................................................7, 8, 9, 10

Utah Admin. Code R. 307-101-1 (2011) .......................................................................35

**FEDERAL REGISTER NOTICES**

65 Fed. Reg. 77,698 (Dec. 12, 2000) ....................................................................20, 25

71 Fed. Reg. 2620 (Jan. 17, 2006) ..........................................................................35

72 Fed. Reg. 37,818 (July 11, 2007).........................................................................36

73 Fed. Reg. 16,436 (Mar. 27, 2008).................................................................35, 36

**LAW REVIEW ARTICLES**

Jamison E. Colburn, *Habitat and Humanity: Public Lands Law in the Age of Ecology*, 39
    Ariz. St. L.J. 145 (2007) ..........................................................................40

Debra L. Donahue, *Federal Rangeland Policy: Perverting Law and Jeopardizing
    Ecosystem Services*, 22 J. Land Use & Envtl. L. 299 (2007) ...................................40

Defendant U.S. Bureau of Land Management (BLM) manages more than two million acres of public lands on the Colorado Plateau in south-central Utah that includes some of the State's most iconic and remote natural landscapes, including the rugged Henry Mountains, the famed Dirty Devil River and its serpentine side canyons, and wild "badlands" containing unique geological structures.  In 2008, BLM finalized the Richfield Resource Management Plan (RMP), which serves as the blueprint for management of these public lands.

In the Richfield RMP, BLM authorized off-highway vehicle (OHV)[1] use on 4,277 miles of dirt roads and trails—enough miles to drive from Atlanta, GA to Anchorage, AK.  As BLM recognizes, OHV use on public lands increases erosion of sensitive soils, damages and destroys irreplaceable archeological sites, disturbs wildlife, and increases air pollution, among other impacts.  Yet, prior to authorizing a spider web of OHV routes, BLM failed to comply with a host of laws designed to protect these resources.  BLM also violated specific mandates to prioritize designation of areas of critical environmental concern (ACECs) and to consider recommending rivers with outstanding and remarkable values to Congress for designation as wild and scenic rivers.

## BACKGROUND

The Federal Land Policy and Management Act (FLPMA) directs BLM to prepare land use plans to govern management of public lands.  *See* 43 U.S.C. § 1712(a).  BLM makes numerous decisions in its land use plans, such as whether lands are open to use by OHVs,

---

[1] The terms "off-highway vehicle" (OHV) and "off-road vehicle" (ORV) are synonymous.  BLM defines ORVs to mean "any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain."  43 C.F.R. § 8340.0-5(a); *see also* Administrative Record (AR) SUPP008564 (PRMP at G-12).

mining, and oil and gas development.  *See, e.g.*, AR SUPP002210-12 (ROD at 15-17).[2]  BLM

also decides whether it will designate ACECs and whether waterways will be recommended for

protection as wild and scenic rivers.  *See id.*  Under FLPMA's criteria for establishing land use

plans, designation of ACECs is the only land use that is given "priority."  43 U.S.C.

§ 1712(c)(3).  Once BLM has established a land use plan, all future site-specific land use

authorizations within the planning area must be consistent with the plan.  *Id.* § 1732(a); 43

C.F.R. § 1601.0-5(b).

This case involves the 2008 Richfield RMP, a land use plan covering the public lands of

the Richfield Field Office, also known as the Richfield planning area.  Located in south-central

Utah, the Richfield RMP governs management of 2.1 million acres of BLM land—most of which

is sandwiched between Capitol Reef National Park and the Glen Canyon National Recreation

Area.  AR SUPP007437 (PRMP at ES-1); AR SUPP009007 (PRMP Map 1-1).  The Richfield

planning area includes some of Utah's most iconic and remote natural landscapes.  *See, e.g.*,

Decl. of Ray Bloxham ¶¶ 32-35 (Ex. 1).  For example, BLM has recognized that more than half

of the 2.1 million acres in the planning area are "wilderness-quality" lands, meaning they are

natural areas with "outstanding opportunities for solitude or primitive and unconfined

recreation."  *See* AR SUPP007721-22, 7754-55 (PRMP at 3-85 to -86, 3-118 to -119).

The famed Dirty Devil River and its many side canyons wind through the heart of the

---

[2] In this brief, the administrative record will be cited as AR #####, and the supplemental administrative record will be cited as AR SUPP#####.  For the Court's convenience, SUWA has provided all record citations and other relevant materials as Exhibits.  Cites to the AR are included in Exhibit 8; cites to the Supplemental AR are included in Exhibit 9 (see attached indices for detailed descriptions).  SUWA has also provided the Court with courtesy copies of the full Record of Decision and Approved Resource Management Plan (ROD) and the Proposed Resource Management Plan and Final Environmental Impact Statement (PRMP).  Excerpts of the ROD and PRMP are included in Exhibits 6 and 7.

planning area.  *See* AR SUPP009063, 9068-69 (PRMP Maps 3-9, 3-14, 3-15).  The rugged

Henry Mountains—the last mountain range to be mapped in the lower 48 states—rise to over

11,000 feet in the southern-most part of the planning area.  *See id.*  And thousands of

archaeological sites dot the landscape and provide a window into the world of the Ancestral

Puebloan and other cultures that made the canyons and mountains their home for thousands of

years before the arrival of European explorers.  *See* AR SUPP007673-76 (PRMP at 3-37 to -40).

BLM conducted public scoping for the Richfield RMP in 2002 and released its draft

RMP and environmental impact statement (EIS) in October 2007.  AR SUPP000001-1244.[3]  The

proposed RMP and final EIS (PRMP) followed in August 2008.  AR SUPP007417-9074.  After

resolving all protests without making significant changes to the proposed RMP, BLM issued its

Record of Decision (ROD) and Approved RMP on October 31, 2008.  AR SUPP002176-2767.

The ROD approves final BLM decisions regarding OHVs, ACECS, and wild and scenic rivers

that plaintiffs Southern Utah Wilderness Alliance *et al.* (collectively, SUWA) are challenging in

this case.  SUWA participated throughout each stage of the process, consistently advocating for a

plan that would adequately protect the resources at stake and exhaustively addressing each of the

issues before this Court.  *See, e.g.*, AR 002957-87 (scoping comments); AR SUPP004834-976

(comments on draft RMP); AR SUPP005597-749 (protest).[4]

The ROD approves two significant final actions regarding OHVs.  First, the ROD

designates lands within the planning area as (1) "open" (9,980 acres), (2) "closed" (209,900

---

[3] As BLM recognizes, approval of a resource management plan is a "major Federal action significantly affecting the quality of the human environment" and therefore preparation of an environmental impact statement is required under the National Environmental Policy Act (NEPA).  43 C.F.R. § 1601.0-6; *see also* 42 U.S.C. § 4332(2)(C).

[4] As demonstrated in the declarations attached in Exhibit 1, SUWA has standing in this case.

acres), or (3) "limited" (1.9 million acres) to OHV use.  AR SUPP002212 (ROD at 17).  Within

open areas, OHVs can drive anywhere, path or no path.  Closed areas are closed to all OHV use.

Within "limited" areas, OHVs may only drive on designated routes.  *See, e.g.*, AR SUPP002230

(ROD at 35).  Second, the ROD approves BLM's final decision to designate 4,277 miles of dirt

roads and trails where OHVs may drive within the 1.9 million "limited" acres.  *See* AR

SUPP002214-16, 2554-57, 2738 (ROD at 19-21, A9-1 to -4, Map 16); AR SUPP007549 (PRMP

at 2-81).  BLM also authorized vehicles to be driven and parked anywhere up to fifty feet on

either side of the designated routes, and up to 150 feet on either side of routes leading to

campsites.  AR SUPP008146 (PRMP at 4-342).  These route designations are known as the

"travel plan."[5]

   Prior to finalization of the travel plan, the majority of the Richfield planning area was

open to cross-country travel and generally lacked designated routes.  *See, e.g.*, AR SUPP007734-

35 (PRMP 3-98 to -99).  In the years leading up to the planning process, OHV use had greatly

increased within Utah and the Richfield planning area.  *See, e.g.*, AR SUPP007734-36 (PRMP

3-98 to -100).  The result was a network of user-created routes that BLM had never analyzed.

*Cf.* Decl. of Ray Bloxham ¶¶ 36-40 (showing that many of the user-created routes are impassable

to vehicles or so faint as to be nearly impossible to identify on the ground).  The RMP's travel

plan formalized this arrangement by officially designating the vast majority of user-created

---

[5] As BLM recognizes, the open, closed, and limited designations are "land use planning
decision[s]," whereas the route designations are "implementation decisions."  AR SUPP002214
(ROD at 19).  Land use planning decisions may require implementation through future, site-
specific decisions.  *See, e.g.*, AR SUPP009076, 9080-86 (identifying various issues in the
Richfield RMP where future site-specific decisions will take place).  In contrast, implementation
decisions like the route designations constitute "BLM's final approval for allowing on-the-
ground actions to proceed."  AR SUPP002556 (ROD at A9-3); *see also* AR SUPP002214 (ROD
at 19).

routes throughout the Richfield Field Office for OHV use.  *See, e.g.*, AR SUPP002214-16 (ROD at 19-21) (designating 4,277 miles of routes for vehicle travel).

As the Richfield RMP indicates, intensive OHV use—like that authorized in the RMP—causes significant environmental damage.  For example, the area's sensitive biological soils crusts are particularly "susceptible to impacts from compaction and disturbance, which can lead to accelerated erosion, soil loss, and reduced productivity."  AR SUPP007825 (PRMP at 4-21); *see also* AR SUPP007825, 7829 (PRMP at 4-21, 4-25) (OHV travel causes "trampling of vegetation and biological soil crusts, which leads to compaction and accelerated erosion"); AR 45767-77 (U.S. Geological Survey study finding Colorado Plateau soils to be particularly susceptible to OHV disturbance).  OHV routes are a prime source of sediment pollution in rivers and streams, particularly where the routes cross through riparian areas.  AR SUPP007844-45 (PRMP at 4-40 to -41) (RMP authorizes 400 stream crossings); *see also* AR SUPP007857, 7864 (PRMP at 4-53, 4-60) (describing impacts to vegetation).

OHV use may also destroy wildlife habitat and imperil sensitive species.  *See* AR SUPP007954-55 (PRMP at 4-150 to -151); AR 2035958 (BLM acknowledging that "OHV use within special status species habitats has the potential to lead to direct mortality of the species via the crushing of plants by tires, and indirect mortality from increases in erosion and sedimentation").  Additionally, BLM has recognized that OHV use causes "long-term" damage to cultural resources that "typically cannot be reversed."  AR SUPP007881 (PRMP at 4-77); *see also* AR SUPP007888 (PRMP at 4-84) (describing damage from collection of artifacts, vandalism, and camping on or driving across resources).

The ROD also approves final designations of two ACECs totaling 2,530 acres.  AR

SUPP002212, 2231 (ROD at 17, 36).  Prior to adoption of the Richfield RMP, the planning area

included four ACECs, totaling 14,780 acres.  AR SUPP008604 (PRMP at A1-2).  BLM

designated these ACECs to protect important values, such as unique badland topography and

relict vegetation.  AR SUPP008610 (PRMP at A1-8).  During the planning process, BLM

recognized an additional sixteen areas totaling 886,810 acres that had important resource values

and met the ACEC criteria.  AR SUPP008608-09 (PRMP at A1-6 to -7).  However, of the more

than 900,000 acres of potential and existing ACECs, BLM designated just 0.3 percent.  *See* AR

SUPP002231 (ROD at 36).  Instead of protecting the other 99.7%, BLM opened the lands to

destructive activities such as OHV use.  *See, e.g.*, AR SUPP008253 (PRMP at 4-449).

     Although numerous desert streams wind their way through the canyons of the Richfield

planning area, including the Dirty Devil River and its tributaries, the ROD includes

recommendations for Congress to designate just one river segment, the Fremont Gorge on the

Fremont River, for consideration as a "wild river" under the Wild and Scenic Rivers Act.  AR

SUPP002212 (ROD at 17).  BLM excluded important desert streams from consideration as wild

and scenic rivers based solely on their ephemeral flows.  *See* AR 044633-35, 44639.

## STANDARD OF REVIEW

     Because the federal laws at issue in this case do not provide for private causes of action,

the Administrative Procedure Act (APA) governs this Court's review.  *See Utah Shared Access

Alliance v. Carpenter*, 463 F.3d 1125, 1134 (10th Cir. 2006).  Under the APA, courts must

invalidate agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706(2)(A).  An action is arbitrary and capricious

if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Additionally, a change in an agency's legal interpretation is arbitrary and capricious where the agency fails "to supply a reasoned analysis for that change." *Id.* at 42, 46-57.

## ARGUMENT

BLM violated the following laws when it finalized the Richfield RMP and travel plan: (1) BLM violated its own OHV regulations by authorizing a spider web of OHV routes without minimizing the impacts on soils, vegetation, wildlife, air, water, and cultural resources, 43 C.F.R. § 8342.1(a)-(c); (2) BLM violated the National Environmental Policy Act (NEPA) by failing to take a "hard look" at the environmental impacts of OHVs, 42 U.S.C. § 4332(2)(C); (3) BLM violated the National Historic Preservation Act (NHPA) by failing to "take into account" the impact of OHV routes on irreplaceable archeological sites, 16 U.S.C. § 470f; (4) BLM violated Secretarial Order 3226 and NEPA by failing to consider OHV damage in the context of the pressing threat of climate change; (5) BLM violated FLPMA by failing to ensure compliance with federal and state air quality standards, 43 U.S.C. § 1712(c)(8); (6) BLM also violated FLPMA by failing to prioritize the designation of ACECs, *id.* § 1712(c)(3); and (7) BLM violated the Wild and Scenic Rivers Act by eliminating important streams from consideration based solely on their ephemeral flows, 16 U.S.C. §§ 1273(b), 1286(b).

## I.    BLM Failed to Follow Its Own "Minimization Criteria" Regulations in the Preparation of the Richfield RMP Travel Plan

The Richfield planning area holds important resources that can be seriously damaged by

off-highway motor vehicles.  *See supra* at 5.  Despite this fact, the Richfield RMP travel plan leaves ninety percent of the BLM-managed surface area, about 1.9 million acres, open to OHVs. AR SUPP008146 (PRMP at 4-342).  The travel plan designates 4,277 miles of dirt roads and trails for OHV use, with approximately 400 stream crossings, and permits vehicles to be driven and parked anywhere up to fifty feet on either side of these routes, and up to 150 feet on either side of routes leading to campsites.  *Id.*; AR SUPP007845 (PRMP at 4-41).

BLM failed to minimize the impacts of the spider web of routes authorized under the travel plan on important public lands resources such as soils, watersheds, vegetation, air, wildlife, and cultural resources, in violation of its own regulations.  43 C.F.R. § 8342.1(a)-(c). BLM not only failed to apply the minimization criteria to the designated routes, it in fact applied the wrong criteria.  Moreover, BLM's decision documents include no discussion of the specific impacts that the designated routes will have to any resources.  Instead, the documents identify only highly general impacts that may occur, without reference to any specific route.  *See* AR SUPP008144-47 (PRMP at 4-340 to -343).  As a consequence, BLM's route designations violate the substantive standards contained in its regulations.

**A.  BLM's Minimization Criteria Require BLM to Minimize the Impacts of Route Designations to Resources**

In response to the growing use of OHVs and attendant environmental damage, Presidents Nixon and Carter issued executive orders which mandated that BLM only allow OHV use on public lands if certain conditions were met.  Exec. Order No. 11,644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 25, 1977).[6]  Following the

---

[6] These orders are binding on BLM and enforceable as law.  *See Conservation Law Found. of New Eng. v. Clark*, 590 F. Supp. 1467, 1477-78 (D. Mass. 1984), *aff'd*, *Conservation Law*

requirements of these executive orders, BLM issued regulations requiring that OHV trails be located to protect the environment. *See* 43 C.F.R. §§ 8340-42. These requirements, often referred to as the "minimization criteria," mandate that designation of OHV routes *shall* minimize: (1) damage to soil, watershed, vegetation, air, and other public lands resources; (2) harassment of wildlife or significant disruption of wildlife habitats; and (3) conflicts between OHV uses and other recreational uses and compatibility with existing populated areas taking into account noise. *Id.* § 8342.1(a)-(c); *see also* Exec. Order 11,644; Exec. Order 11,989.

A number of federal courts have recognized that BLM and other federal land management agencies must apply the minimization criteria when designating routes and provide a reasonable articulation of the basis for the conclusion that such designations "minimize" impacts to important resources. *See Wildlands CPR, Inc. v. U.S. Forest Serv.*, ---F. Supp. 2d---, 2012 WL 1072351, at \*14 (D. Mont. Apr. 2, 2012) (holding Forest Service must apply the minimization criteria to route-specific designations); *Defenders of Wildlife v. Salazar*, ---F. Supp. 2d---, 2012 WL 2812309, at \*28 (M.D. Fla. July 10, 2012) ("In the instant case, [the National Park Service] has failed to articulate whether or how it applied the minimization criteria to the 2007 decision."); *Idaho Conservation League v. Guzman,* 766 F. Supp. 2d 1056, 1068 (D. Idaho 2011) (striking down Forest Service travel planning process where record did not reveal the agency's reasoning on minimization criteria); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1080 (N.D. Cal. 2009) ("[N]othing in the administrative record explains or documents how the [minimization criteria] were considered."); *cf. Wilderness Soc'y v. Bureau of Land Mgmt.*, 822 F. Supp. 2d 933, 945-49 (D. Ariz. 2011), *on appeal*, No. 11-17482

---

*Found. of New Eng. v. Sec'y of the Interior*, 864 F.2d 954 (1st Cir. 1989).

(9th Cir.) (upholding route designations where agency prepared an evaluation report for every route with information regarding the route, resources impacted, and reasons for minimization decision).[7]  When specific routes are designated, the minimization criteria must be applied on a route-by-route basis.  *Wildlands CPR*, 2012 WL 1072351, at *14 (citing *Idaho Conservation League*, 766 F. Supp. 2d at 1074; *Conservation Law Found.*, 590 F. Supp. at 1477).

### B.  Rather Than Applying the Minimization Criteria Expressly Required by 43 C.F.R. Section 8342.1, BLM Applied a Less-Protective Standard

As set out above, BLM's implementing regulations provide that designation of OHV routes *shall* minimize: (1) damage to soil, watershed, vegetation, air and other public lands resources; (2) harassment of wildlife or significant disruption of wildlife habitats; and (3) conflicts between OHV uses and other recreational uses and compatibility with existing populated areas taking into account noise.  43 C.F.R. § 8342.1(a)-(c).  In designating 4,277 miles of routes, BLM did not apply these standards.  BLM fails to even discuss the minimization criteria of 43 C.F.R. § 8342.1 in the ROD, RMP, or any other travel planning documents.

In fact, with respect to impacts to soil, watershed, vegetation, air, and cultural resources BLM applied a different, less protective standard.  According to the ROD, BLM decided to "[d]esignate routes for motorized use unless *significant, undue damage* to or disturbance of the soil, wildlife, wildlife habitat, improvements, cultural or vegetative resources, or other authorized uses of the public lands is imminent."  AR SUPP002322 (ROD at 125) (emphasis added).  Rather than seeking to minimize damage to these resources as required by 43 C.F.R. § 8342.1,

---

[7] The requirement that federal agencies explain how they applied the minimization criteria is an application of the basic administrative law principle that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotations and citation omitted).

BLM's approach established a presumption in favor of motorized use by providing that such use would be the norm unless "significant, undue damage" was "imminent."[8]

Appendix 9 to the RMP confirms BLM's failure to apply the minimization criteria. Appendix 9 is a four page document entitled "Travel Management/Route Designation Process," which contains the entirety of BLM's discussion of how it designated over 4,000 miles of routes for motorized use.  AR SUPP008815-18 (PRMP at A9-1 to -4).  As in the body of the RMP, no mention is made of minimization of impacts to public lands resources; in fact, the word "minimize" does not even appear in Appendix 9.  *See id.*  Instead, this document states that the BLM and county employees who worked on the route designations would "[d]esignate existing routes for motorized use unless closed or restricted . . .  as appropriate to address specific resource concerns."  AR SUPP008815 (PRMP at A9-1).  Under this approach, BLM's assumption was that existing routes will remain open.  Although the appendix states that various factors including environmental sensitivity and wildlife habitat were "considered," it provides no information about how those factors were used to designate routes or minimize impacts.  *See* AR SUPP008815-16 (PRMP at A9-1 to -2).  BLM violated its own regulations by failing to apply the minimization criteria.

### C.  The Richfield Route Designations Are Not Supported by the Evidence in the Administrative Record

As discussed above, BLM must apply the minimization criteria on a route-by-route basis

---

[8] While the ROD goes on to state that routes will be designated so as to minimize harassment of wildlife and conflicts with other uses, AR SUPP002322 (ROD at 125), BLM ignores the other resource values protected through the minimization criteria (e.g., soils, vegetation, air). Moreover, as explained *infra* at 12-14, there is no support in the record for the idea that BLM applied the minimization criteria with respect to any of the resource values, including wildlife and user conflicts.

and provide a rational explanation for its route designations that is supported by evidence in the record.  *See, e.g.*, *Wildlands CPR*, 2012 WL 1072351, at *14; *Ctr. for Biological Diversity*, 746 F. Supp. 2d at 1080.   BLM's Richfield travel plan falls far short of this standard.

The record contains no explanation of *how* BLM considered the command to minimize impacts to public lands resources.  According to BLM, the route designation process was based on a route inventory which began in 2002, and used "a variety of methods" to inventory existing ways and routes within the planning area.  AR SUPP008815 (PRMP at A9-1).  According to the Richfield RMP, BLM then applied various factors, such as soil type, riparian areas, and sensitive plant species, to the route inventory.  *See* AR SUPP008815-16 (PRMP at A9-1 to -2).

However, this is as far as the information in the administrative record goes.  The record contains no coherent information regarding the resources that BLM claims to have factored into its decision and no reasoned explanation of how the 4,277-mile route network minimizes impacts to public lands resources.  The analysis of the minimization criteria must take place at the route specific level, not in some general sense.  *Wildlands CPR*, 2012 WL 1072351, at *14.

The only information about the routes contained in the record is in cryptic spreadsheets which identify route segments by number and contain a series of columns which have headings including "Other Resource" and "Mitigation."  *See, e.g.*, AR 2062725.  However, there is no key to these spreadsheets, no explanation of how the information in them was collected, and no indication how the information in them was used.  *See, e.g.*, AR 2062724-25.  The spreadsheets are not discussed anywhere in the decision documents, and the vast majority of the route segments have either no notations or at best extremely cryptic notations.  *See, e.g.*, *id.*  These unintelligible spreadsheets do not form an adequate basis for the route designations.  *Cf. Sierra*

*Club v. U.S. Forest Serv.*, 857 F. Supp. 2d 1167, 1175-76 (D. Utah 2012) (unintelligible spreadsheets are not adequate disclosure of route designation impacts under NEPA).

The courts in *Idaho Conservation League,* 766 F. Supp. 2d 1056, and *Center for Biological Diversity*, 746 F. Supp. 2d 1055, struck down route designations based on similar agency failures to adequately explain how the designations would minimize resource conflicts. In *Idaho Conservation League*, the Forest Service had prepared "Route Designation Matrices," which contained information such as watershed criteria, erosion potential, sensitive plants, ease of enforcement, and various other issues.  766 F. Supp. 2d at 1071-72.  Yet even these matrices, which contained much more detailed information than the BLM spreadsheets here, did not suffice to show that the minimization criteria were actually implemented.  *See id.*  As the court stated,

> [t]here is no way to know how or if the Forest Service used this information to select routes with the objective of minimizing impacts.  Without some explanation for how this information was implemented, the Forest Service has failed to meet the regulatory requirements contained in the [Forest Service's regulations implementing the minimization criteria].[9]

*Id.*

Likewise, in *Center for Biological Diversity*, the court found that route designation forms prepared for each route segment, which contained only skeletal information about the routes and resources, were not sufficient to show BLM's implementation of the minimization criteria.  746 F. Supp. 2d at 1078-79.  Unlike the record here, these forms even included a recitation of the standards from 43 C.F.R. § 8342.1.  *Id.*  Yet as the court stated, "there is no indication on the forms themselves that these criteria have actually been considered or applied."  *Id.* at 1079.  Just

---

[9] The court in *Idaho Conservation League* specifically held that the Forest Service regulations at issue there contained the same minimization criteria as the BLM regulations.  *Id.* at 1072.

like in these two cases, the record here contains no evidence to demonstrate that BLM applied

the minimization criteria to its designation of 4,277 miles of routes.  Accordingly, BLM has

failed to "examine the relevant data and articulate a satisfactory explanation for its action."  *See

Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotations and citation omitted).

## II.    BLM Violated NEPA by Failing to Take a "Hard Look" at the Full Impacts of Designating 4,277 Miles of Routes

The Richfield RMP travel plan also falls well short of NEPA's requirement that federal

agencies take a "hard look" at the environmental impacts of their decisions.  42 U.S.C.

§ 4332(2)(C); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).  This

requirement seeks to ensure informed and transparent agency decision-making.  *Baltimore Gas

& Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  To satisfy the hard look

requirement, an EIS first must describe the existing environment that will be affected by the

proposal and then analyze and disclose any significant impacts of the proposed action.  42 U.S.C.

§ 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.15, 1502.16, 1508.8.  BLM has failed to do so for the

travel plan.

The many damaging effects that OHVs can have on public lands and resources are well

documented in the record.  *See supra* at 5*; see also, e.g.*, AR 015857-63 ("effects include soil

compaction . . . , accelerated soil erosion, and air and water pollution[,] . . . crushing and

shredding of plants and soil crusts, destruction of myriad biological soil constituents, and killing

or maiming of wild animals").  For example, as BLM itself stated, "the more area open to OHV

use, the greater the potential for adverse impacts to soil resources from trampling of vegetation

and biological soil crusts, which leads to compaction and accelerated erosion."  AR

SUPP007829 (PRMP at 4-25).

Despite its recognition of the serious impacts from OHV use, BLM's discussion of the effects of designating 4,277 miles of routes in the RMP ranges from skeletal to non-existent.  For example, with respect to soil impacts, the discussion of "travel management" consists of a single paragraph.  AR SUPP007829, 7835-36 (PRMP at 4-25, 4-31 to -32).  For impacts to water quality, the RMP devotes approximately half a page of text with no specific discussion, although the route network designated includes 400 stream crossings, resulting in direct and indirect impacts to water quality.  AR SUPP007844-45, 7850-51 (PRMP at 4-40 to -41, 4-46 to -47).  Although the RMP acknowledges that impacts to cultural resources will occur, it includes only a very generalized discussion of those impacts.  AR SUPP7895-96 (PRMP at 4-91 to -92); *see also* AR SUPP007888-89 (PRMP at 4-84 to -85).[10]

This type of generalized analysis was rejected in *Center for Biological Diversity*.  There the court found that the environmental analysis discussed soils and OHV impacts at some length, but did not actually discuss the impacts from the proposed routes: "what is lacking from the [environmental analysis] is a discussion of how soils would be impacted by the proposed . . . route network."  746 F. Supp. 2d at 1094.  With respect to cultural resources, the court said that "[i]f impacts on cultural resources *were* considered in the route designation process, BLM has this information and it should have been distilled and presented in the [environmental analysis]." *Id.* at 1096.  With respect to riparian areas, the court found that there was no discussion of the actual impacts of the routes at issue.  *Id.* at 1096-97.  The analysis in the Richfield RMP does not even rise to level of the analysis rejected in *Center for Biological Diversity*.  Here, there is

---

[10] The agency concedes that reducing the area in which off-route travel for camping is allowed would "minimize disturbance to cultural resources."  AR SUPP007898 (PRMP at 4-94). However, the agency did not implement this necessary minimization action.  *See infra* at 16-17, 26.

simply no information on the impacts of the actual routes designated in violation of NEPA.

Additionally, while the RMP acknowledges the adverse impacts of OHVs on riparian areas generally, any site specific actions to protect those areas from OHVs are left to "the project level."  *See* AR SUPP007538, 7864 (PRMP at 2-70, 4-60).  At the same time, BLM acknowledges that route designation *is* a project-level decision that will permit immediate impacts on riparian resources.  AR SUPP002556 (ROD at A9-3); *see also* AR SUPP002214 (ROD at 19).  As BLM concedes, the ecological significance of riparian resources far exceeds their limited area.  AR SUPP007668 (PRMP at 3-32).  Therefore, analysis of necessary mitigation is essential.  BLM's decision to allow impacts to riparian areas first and analyze mitigation later is a clear violation of NEPA.  *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009) (site-specific analysis "of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made" (quoting NEPA)).

The Richfield RMP also fails to take into account the actual physical area which will be made available to OHV use.  *See* 40 C.F.R. § 1502.15 (requiring agencies to consider the "affected environment"); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1163 (N.D. Cal. 2006) ("[B]ecause the "Affected Environment" chapter of the EIS sets the 'baseline' for the environmental analysis that is the heart of the EIS, it is important that the baseline be accurate and complete.").  The travel plan allows off-route use up to fifty feet on either side of designated routes for "parking and staging," and use of "existing spurs" (a term which is not defined) to travel up to 150 feet to campsites.  AR SUPP008146 (PRMP at 4-342); AR SUPP002323 (ROD at 126).  Using the fifty foot distance alone, this means that every route

has a one-hundred-foot-wide corridor in which motorized use is permitted.  For the 4,277 miles

of routes designated, this corridor amounts to approximately 50,000 acres which are open to

cross-country motorized use.  Yet the RMP and the administrative record contain no information

whatsoever about the impacts of the routes designated to soils, vegetation, or other public lands

resources in these areas.  *See, e.g.*, AR SUPP007895 (PRMP at 4-91) (noting only that area of

potential impact from off route use for camping and parking would be less than in other

alternatives).  Because BLM failed to provide the "hard look" which NEPA requires, reversal

and remand to the agency are required.

III.    **BLM Violated the National Historic Preservation Act by Failing to Take Into
        Account the Impact of the Travel Plan on Archeological Resources**

        A.  **The Richfield Planning Area Contains Significant, Irreplaceable Archaeological
            Resources That Are Being Damaged by OHVs**

        The Richfield planning area contains evidence of human activities dating back more than

10,000 years as well as more recent visitation and habitation.  AR SUPP007673 (PRMP at 3-37);

*see also* AR SUPP007678 (PRMP at 3-42) ("The area encompassed by the planning area

boundary has seen considerable prehistoric and historic Native American use.").  The prehistoric

sites, including shelters and stone artifacts, contain a treasure trove of archeological information

that provides a glimpse into the lives of early inhabitants of the Colorado Plateau.  Several

Native American tribes have ancestral ties to the lands encompassed by the Richfield planning

area, including the Hopi Tribe, Paiute Indian Tribe of Utah, and Navajo Nation.  *See* AR

SUPP007678-79 (PRMP at 3-42 to -43).  There are also significant historic sites in the Richfield

planning area dating from the expedition of Fathers Dominguez and Escalante in 1776-77 to the

present and include examples of farming, ranching, mining, and government management.  *See*

AR SUPP007674 (PRMP at 3-38).

Despite the wealth of archeological resources within the Richfield planning area, less than five percent of this area has been inventoried for cultural resources. *See* AR SUPP007673 (PRMP at 3-37). As BLM has acknowledged, "the [Richfield Field Office] has little or no data as to the nature, diversity or distribution of cultural resources on roughly 95 to 99% of the land it manages." AR 2016647. Nor did BLM undertake *any* cultural resource inventories as part of its preparation of the Richfield RMP; rather, it used what little information it had on hand when it began the planning process to make important resource allocation decisions. *See id.*; AR SUPP007884 (PRMP at 4-80) ("To analyze the potential effects of the alternatives on archaeological and historical resources, information was gathered from inventories and excavations in and adjacent to the Planning Area. However, less than 1% of the [field office] has been inventoried and only a handful of excavations have been conducted."). As a result, BLM did not know whether cultural resources were present on the thousands of user-created routes and adjacent areas that were being considered for trail designation. *See* AR 006877 (noting that BLM had intensive survey results for only 216 routes—in Wayne County, one of several counties in the planning area—of the approximately 5,000 designated for travel).

Although BLM failed to survey for additional sites as part of the RMP process, it acknowledged that on the basis of the limited site monitoring that exists, the condition of known archaeological sites in the Richfield Field Office is deteriorating. AR SUPP007677 (PRMP at 3-41). Moreover, BLM recognized that motorized vehicle use in the Richfield Field Office is damaging cultural resources. *See, e.g.*, AR 2016647; AR 006877; AR SUPP007881 (PRMP at 4-77) (BLM recognizing that OHV use causes "long-term" damage to cultural resources that

"typically cannot be reversed"); AR SUPP007888-89 (PRMP at 4-84 to -85) (describing damage

from collection of artifacts, vandalism, and camping on or driving across resources).  Indeed, the

Colorado Plateau Archaeological Alliance commented that improper OHV use "constitutes

perhaps the greatest single threat to the long-term preservation of cultural resources in the

[Richfield Field Office]."  AR 033690; *see also* AR SUPP007884 (PRMP at 4-80) (documenting

Native American concern about the direct correlation between OHV routes and vandalism to

resources that are central to Native American culture and religion).

## B.  The NHPA and Its Implementing Regulations Require BLM to Consider the Adverse Impacts of Its Undertakings on Archeological Resources

Congress enacted the NHPA in 1966 to implement a broad national policy encouraging

the preservation and protection of America's historic and cultural resources.  *See* 16 U.S.C.

§§ 470(b), 470-1.  The heart of the NHPA is Section 106, which prohibits federal agencies from

approving any federal "undertaking" unless the agency takes into account the effects of the

undertaking on historic properties that are included in or eligible for inclusion in the National

Register of Historic Places.  16 U.S.C. §§ 470f, 470w(7); *see also Pueblo of Sandia v. United

States*, 50 F.3d 856, 859 (10th Cir. 1995).  Section 106 is a "stop, look, and listen provision" that

requires federal agencies to consider the effects of their actions and programs on historic

properties and sacred sites before implementation.  *Muckleshoot Indian Tribe v. U.S. Forest

Serv.*, 177 F.3d 800, 805 (9th Cir. 1999); *see also Valley Cmty. Pres. Comm'n v. Mineta*, 373

F.3d 1078, 1085 (10th Cir. 2004).

To adequately "take into account" the impacts on archeological resources, all federal

agencies must comply with binding Section 106 regulations established by the Advisory Council

on Historic Preservation (Advisory Council).[11]   Under these regulations, the first step in the

Section 106 process is for an agency to determine whether the "proposed [f]ederal action is an

undertaking as defined in [Section] 800.16(y)."  36 C.F.R. § 800.3(a).  Undertakings include any

permit or approval authorizing use of federal lands.  *Id.* § 800.16(y).  If the proposed action is an

undertaking, the agency must determine "whether it is a type of activity that has the potential to

cause effects on historic properties."  *Id.* § 800.3(a).  An effect is defined broadly to include

direct and indirect adverse effects that might alter the characteristics that make a cultural site

eligible for listing in the National Register of Historic Places.  *See id.* § 800.16(i); 65 Fed. Reg.

77,698, 77,712 (Dec. 12, 2000).

        The agency next "[d]etermine[s] and document[s] the area of potential effects" and then

"[r]eview[s] existing information on historic properties within [that] area."  36 C.F.R.

§ 800.4(a)(1)-(2).  "Based on the information gathered, . . . the agency . . . shall take the steps

necessary to identify historic properties within the area of potential effects."  *Id.* § 800.4(b).

"The agency shall make a reasonable and good faith effort to carry out appropriate identification

efforts."  *Id.* § 800.4(b)(1).

        If the undertaking is a type of activity with the potential to affect historic properties then

the agency must determine whether in fact those properties "may be affected" by the particular

---

[11] The Advisory Council, the independent federal agency created by Congress to implement and
enforce the NHPA, has exclusive authority to determine the methods for compliance with the
NHPA's requirements.  *See Nat'l Ctr. for Pres. Law v. Landrieu*, 496 F. Supp. 716, 742 (D.S.C.
1980), *aff'd per curiam,* 635 F.2d 324 (4th Cir. 1980); *CTIA-Wireless Ass'n v. F.C.C.*, 466 F.3d
105, 115 (D.C. Cir. 2006) ("[T]he Advisory Council regulations command substantial judicial
deference.") (quotations and citations omitted).  The Advisory Council's regulations "govern the
implementation of Section 106" for all federal agencies.  *Nat'l Ctr. for Pres. Law*, 496 F. Supp.
at 742; *see also Nat'l Trust for Historic Pres. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 784,
790-91 (S.D. Ohio 1982).

undertaking at hand.  *Id.* § 800.4(d)(2).[12]  Having identified the historic properties that may be affected, the agency considers whether the effect will be adverse, using the broad criteria and examples set forth in section 800.5(a)(1).  Adverse effects include the "[p]hysical destruction of or damage to all or part of the property."  *Id.* § 800.5(a)(2)(i).  If the agency concludes that the undertaking's effects do not meet the "adverse effects" criteria, it is to document that conclusion and propose a finding of "no adverse effects."  *Id.* § 800.5(b), (d)(1).  If, however, the agency concludes that there *may be* an adverse effect, it engages the public and consults further with the state historic preservation officer, Native American tribes, and the Advisory Council in an effort to resolve the adverse effects.  *Id.* §§ 800.5(d)(2), 800.6.

### C.  The Richfield Field Office's Travel Planning Decisions Violated the NHPA and BLM's Own Guidance

BLM's assessment and treatment of archeological resources in the travel planning process was based on agency guidance found in Instruction Memorandum No. 2007-030, Clarification of Cultural Resource Considerations for Off-Highway Vehicle (OHV) Designation and Travel Management (IM 2007-030).  AR 2000670-74.  IM 2007-030 rests on the assumption that BLM need not inventory and analyze adverse effects for designation of existing, user-created routes because continued use will not cause additional harm.  In this case, as the record confirms, that assumption was incorrect.  Indeed, BLM's reliance on IM 2007-030 led BLM to violate two clear requirements of the NHPA regulations.[13]  First, BLM violated the NHPA

---

[12] The agency may also determine that there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, at which point it consults with the State Historic Preservation Officer and notifies relevant Indian tribes of its conclusion.  *Id.* § 800.4(d)(1).

[13] *See Comm. to Save Cleveland's Huletts v. U.S. Army Corps of Eng'rs*, 163 F. Supp. 2d 776, 791 (N.D. Ohio 2001) (holding that while the NHPA allows agencies to promulgate their own

regulations by making an unsupported "no adverse impacts" determination.  *See* 36 C.F.R.

§ 800.5(b).  Second, BLM's decision not to conduct any further inventories for cultural resources

located on or along "existing routes" prior to authorizing OHV use violated Section 106's

mandate that the agency make a "reasonable and good faith effort to carry out appropriate

identification efforts."  *Id.* § 800.4(b)(1).

Finally, although IM 2007-030 establishes a general—and here unsupported—

presumption that BLM need not consider impacts on existing routes, it also recognizes this

analysis is necessary if there is a reasonable expectation that a proposed designation will

concentrate travel on existing routes containing cultural resources.  AR 2000671 (IM 2007-030,

Cultural Resource Inventory Requirements § B).  Although that is the case here, BLM still failed

to conduct the required analysis in violation of its own guidance.  Each of these violations

requires that the Court reverse BLM's travel plan and remand for compliance with Section 106.

### 1. BLM's "no adverse effects" determination violated the NHPA regulations and is contrary to evidence in the administrative record

BLM acknowledges that designating routes for OHV use constitutes an undertaking with

the potential to cause adverse effects.  *See* AR 2000670-74.  Accordingly, BLM was required to

proceed with the Section 106 process for its travel plan and make a finding regarding "adverse

effects."  36 C.F.R. § 800.5.  In making its "no adverse impacts" determination, BLM relied on

IM 2007-030, which rests on the assumption that "[p]roposed designations that will not change

or will reduce OHV use are *unlikely to adversely affect* historic properties . . . .  These include

designations that [] allow continued use of an existing route . . . ."  AR 2000671 (emphasis

---

regulations governing compliance with the NHPA, such regulations must be consistent with
Advisory Council's Section 106 regulations).

added); *see also* AR SUPP009452.[14]  This case provides a clear demonstration of why that

assumption is incorrect.  Indeed, BLM's conclusion that the travel plan will have "no adverse

impacts" is contrary to record evidence and violates NHPA regulations.

As an initial matter, BLM knew that the overwhelming majority of routes had not been

surveyed for cultural resources.  *See* AR 006877; AR SUPP007884 (PRMP at 4-80).

Nevertheless, without conducting any new inventories to know what resources might be at risk

from designating motorized use on such "existing routes," BLM determined that the designation

of these routes for OHV use would have "no adverse effect" on cultural resources.  AR 006877.

Moreover, BLM's "no adverse effect" finding is in fact counter to what limited

information BLM had on hand about the threat posed by OHV use.  For example, BLM knew

that 216 routes in Wayne County were surveyed in 1998, more than 110 "significant [cultural

resource] sites" were identified within those existing routes, and some of those cultural resource

sites were at risk of being damaged by continued OHV use.  *See, e.g.*, *id.*  In correspondence

with the state historic preservation officer BLM acknowledged that route designation did in fact

have the potential to adversely affect at least some of those 110 significant sites containing

cultural resources:

> After discussing the situation further, we all agree that, even on designated routes,
> there is *some potential to affects sites that may be located there.  As you
> mentioned previously, there are roads that go through archaeological sites and
> sometimes there are site features within the road that are being damaged.
> Continuing use on those roads may be an adverse effect on any sites located
> there*. . . . On most of the roads designated in the RMP we believe that there will
> be no adverse effect.  We assumed in the analysis that it is beneficial to eliminate

[14] Notably, the term "existing" dirt roads and trails does not mean that BLM had any particular
information or knowledge about how these routes came into being.  Indeed BLM did not claim to
know when any given percentage of these dirt roads and trails were established or the percentage
created simply by the passage of vehicles.  *See supra* at 4-5 (describing existing routes).

> cross-country travel and go to a system of designated routes.  But we are not sure just what is happening to the sites located within the [rights of way] on those roads inventoried in Wayne County.

*Id.* (emphasis added); *see also* AR 2016647 (same); AR 2003673.  BLM's acknowledgment that OHV use may be having adverse effects on known cultural sites cannot be harmonized with its claim that designating thousands of miles of dirt roads and trails for OHV use will have *no adverse effect* on cultural sites located in or along these routes.  *See* AR 006877.  Because BLM's conclusion is contrary to evidence in the record, it must be set aside.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The Section 106 regulations also required BLM to base its conclusion that there would be "no adverse effects" on a determination that route designation would not cause the types of adverse effects identified in section 800.5(a)(2), including "[p]hysical destruction of or damage to all or part of the property," and BLM was required to "maintain a record" of its assessment supporting a finding of no adverse effects to cultural resources.  36 C.F.R. § 800.5(d)(1).  There is no record evidence that BLM complied with either of these obligations.  Accordingly, BLM has failed to comply with the mandatory requirements of the NHPA regulations.

**2.  BLM violated the NHPA regulations by failing to undertake reasonable and good faith efforts to identify significant cultural resources within the Richfield planning area**

The NHPA regulations require that agencies make a "reasonable and good faith effort to carry out appropriate identification efforts."  *Id.* § 800.4(b)(1); *see also Pueblo of Sandia*, 50 F.3d at 860-62 (concluding that Forest Service did not make a reasonable effort to identify historic properties).  As the Advisory Council emphasized in its preamble to the Section 106 regulations, knowing the historic properties at risk from an undertaking is essential: "[i]t is

simply impossible for an agency to take into account the effects of its undertaking on historic properties if it does not even know what those historic properties are in the first place."  65 Fed. Reg. 77,698, 77,715 (Dec. 12, 2000).  Despite the significant cultural resources in the Richfield planning area and the evidence that such sites were already deteriorating, in part, because of OHVs, BLM conducted no additional on-the-ground surveys or reviews beyond the existing limited fieldwork.  *See* AR 2016647; AR SUPPP007884 (PRMP at 4-80).  This failure violates the NHPA regulations and is arbitrary and capricious.

BLM inappropriately relied on IM 2007-030 to justify its failure to inventory for cultural resources.  IM 2007-030 provides that a "Class III [intensive, on-the-ground survey] is not required prior to designations that [] allow continued use of an existing route."  AR 2000671 (citing BLM Manual 8110.21C to define the term Class III inventory).[15]  BLM explained that "the reason for not requiring these [Class III] inventories is quite simple: either no change to the existing situation is being proposed or OHV use will be restricted by the proposal."  AR 2016647.  However, the record in this case shows that BLM expected increased levels of OHV use on "existing routes" in the Richfield planning area to cause additional damage to cultural sites located in and along those routes.

As BLM explained in a letter to the Utah State Historic Preservation Officer, "there are

---

[15] "The BLM cultural resource inventory system is composed of three kinds of inventory: class I - existing information inventory; class II - probabilistic field survey; and class III - intensive field survey (see .21A-C).  Each is designed to provide specific kinds of cultural resource information for various planning and resource management needs.  The most frequently employed method of inventory is class III survey carried out for specific projects to enable BLM to comply with Section 106 of the National Historic Preservation Act (NHPA) before making decisions about proposed land and resource uses."  BLM Manual 8110.21: Identifying and Evaluating Cultural Resources (Dec. 3, 2004) (attached as Ex. 2); *see also* BLM Manual 8110.21A-C (describing in detail class I, II, and III inventories).

roads that go through archeological sites and sometimes there are site features within the road that are being damaged. *Continuing use on those roads may be an adverse effect on any sites located there*." AR 006877 (emphasis added); *see also* AR 2016647 (same). This acknowledgment undercuts the presumption in IM 2007-030 that BLM was not required to conduct an additional inventory (e.g. on-the-ground cultural survey (either a Class II or Class III survey)) prior to designating "existing routes." *See* AR 2000671. Given this evidence, there is no support for BLM's refusal to conduct additional inventories.

Finally, with regard to BLM's decision to permit OHV use up to 150 feet on either side of routes leading to campsites without first inventorying those areas for cultural resources and considering the impact of such use, AR SUPP008146 (PRMP at 4-342), the Richfield Field Office archaeologist stated that this was a "bad idea." AR 2017051. Specifically, he told the field office associate manager that

> I think that allowing dispersed camping within a 300-foot corridor along all the designated routes in the [Richfield Field Office] without consideration of the resource damage that would do is a bad idea. Since the proposal to allow this is ours, it becomes a federal undertaking subject to Section 106 of the [NHPA] just like any other action we approve.

*Id.* This candid assessment further underscores BLM's violation of the NHPA's "reasonable and good faith" inventory requirement.

### 3. BLM failed to comply with its own guidance in IM 2007-030

Even if BLM was entitled to rely on IM 2007-030 for direction on compliance with Section 106, its actions were inconsistent with the plain requirement of that guidance. IM 2007-030 provides:

> [w]here there is a reasonable expectation that a proposed designation . . . will shift, concentrate or expand travel onto other existing routes or into areas that are likely to have historic properties, the potential for cumulative or indirect effects must be taken into account.  Such decisions are subject to section 106 compliance.

AR 2000671.  This was exactly what BLM predicted would happen in the Richfield planning area.  BLM predicted that the travel plan, which reduced the overall acreage of areas open to cross-country travel and directed motorized users to drive designated routes, "*could increase the traffic on the remaining designated routes.*"  AR SUPP008146 (PRMP at 4-342) (emphasis added); *see also* AR SUPP008409 (PRMP at 4-605) (predicting increased concentration of OHV users on designated trails as a result of implementing the RMP).  BLM did not, however, comply with the relevant provision of IM 2007-030 requiring compliance with Section 106.[16]  BLM's failure to comply with its own guidance is arbitrary and capricious and its decision should be set-aside.  *See Lamb v. Thompson*, 265 F.3d 1038, 1046-47 (10th Cir. 2001); *Rocky Mountain Wild v. Vilsack*, 843 F. Supp. 2d 1188, 1196 (D. Colo. 2012).

## IV.  The Travel Plan Violates Secretarial Order 3226 and NEPA Because BLM Failed to Address the Impacts of OHV Use in the Context of Climate Change

BLM's designation of 4,277 miles of OHV routes will degrade sensitive desert soils, causing erosion, dust, and the spread of exotic weeds, among other adverse impacts.  *See* AR SUPP007825, 7829, 7835-36, 7857, 7864-65, 7873-74, 8402-03 (PRMP at 4-21, 4-25, 4-31

---

[16] Because BLM acknowledged that its travel planning decisions could increase use onto designated trails—above and beyond current levels—by the plain terms of IM 2007-030,  it should have fully complied with Section 106 and considered whether its designation decision may have adversely affected cultural resources.  *See* 36 C.F.R. §§ 800.4, 800.5.  This would have included identifying the relevant area of potential effects, including the fifty feet from the center line of the routes where vehicle use is permitted; undertaking a reasonable and good faith effort to identify cultural resources in that area; and applying the criteria set forth in section 800.5(a)(1) to determine whether OHV use may cause adverse effects, and if an adverse effect is found, consult further to resolve it.  *See id.* §§ 800.3-800.5.

to -32, 4-53, 4-60 to -61, 4-69 to -70, 4-598 to -99); *supra* at 5.  That OHV damage, however, will be exacerbated by the most significant long-term threat to the health and resilience of Utah's arid landscapes and resources: climate change.  Although climate science shows that the planning area has entered an era of increased resource vulnerability due to a generally hotter and drier climate, BLM largely ignored this critical issue in developing its travel plan.  Absent analysis of climate change, however, BLM could not reasonably determine whether the significant level of OHV use and resulting ecological degradation under such conditions was justified.  The agency's failure to address OHV impacts in the context of climate change violates federal law.

### A.  BLM Violated Secretarial Order 3226 by Failing to Analyze OHV and Climate Change Impacts

 Given the significance of the threat, the Department of Interior has long recognized the need to account for the impacts of climate change on the public lands and resources that it manages.  In 2001, the Secretary of Interior acknowledged that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making."  Secretarial Order No. 3226 § 1 (Jan. 19, 2001) (attached as Ex. 3).  Accordingly, the Secretary ordered all agencies within the Department to "*consider and analyze* potential climate change impacts when undertaking long-range planning exercises . . . [and] when developing multi-year management plans."  *Id.* § 3 (emphasis added).

Despite the Order's clear mandate that BLM consider and analyze climate change impacts, the agency failed to do so for the RMP and travel plan.[17]  Notably, aside from SUWA's

_____

[17] The Order's requirement that BLM consider climate change impacts when developing RMPs and travel plans is enforceable.  *See Mont. Envtl. Info. Ctr. v. Bureau of Land Mgmt.*, No. 9:08-

28

comments and protest, there is no mention of Secretarial Order 3226 anywhere in the RMP or anywhere else in the administrative record, much less any explanation of how BLM complied with it. The draft RMP and EIS included no discussion of climate change at all. *See* AR SUPP000001-1244. In comments, SUWA, the U.S. Environmental Protection Agency, and others recommended that BLM meaningfully address the issue and provided the agency with studies from credible governmental and non-governmental agencies detailing the relevant impacts. *See* AR SUPP004908-12; AR SUPP009351, 9499, 9537. In fact, SUWA provided BLM with over 600 pages of relevant climate-change-related studies, articles, and reports. *See* AR SUPP004838-40, 3221-328, 3401-02, 4245-50, 4260-64, 4273-485, 4498-723, 4732-33, 4752-94; AR 004107-39.

BLM did not respond to those studies and recommendations and instead inserted general, boilerplate language about climate change into the final EIS. AR SUPP007639-40, 7808-09 (PRMP at 3-3 to -4, 4-4 to -5). BLM's Utah State Office provided the boilerplate language to each of the six field offices revising their RMPs, including Richfield, and directed that the language be inserted into Chapter 3 of the final EIS addressing the affected environment and Chapter 4 addressing environmental impacts. *See* AR 2006232, 6238-41. The general language acknowledges that climate change is "unequivocal" and that "[v]ulnerabilities to climate change depend considerably on specific geographic . . . contexts." AR SUPP007640, 7808 (PRMP at 3-4, 4-4). But BLM made no attempt to "analyze" those vulnerabilities—like the region's increased vulnerability to soil disturbance from OHV use—or how climate change will affect the particular resources at stake in the Richfield planning area. *See* AR SUPP007639-40, 7808-09

cv-178, Order Denying Mot. to Dismiss (D. Mont. May 27, 2009) (attached as Ex. 4); *see also City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 913-18 (10th Cir. 2004).

(PRMP at 3-3 to -4, 4-4 to -5).  In fact, the agency's analysis of the travel management plan does

not even mention climate change.  *See* AR SUPP008140-51, 8409 (PRMP at 4-336 to -47,

4-605).  This failure violates Secretarial Order 3226's mandate that BLM consider and analyze

those impacts as part of its RMP and travel planning process.

### B.  BLM Violated NEPA by Failing to Take a Hard Look at OHV Impacts in the Context of Climate Change

Secretarial Order 3226's requirement to consider and analyze climate change impacts

complements NEPA's mandate that federal agencies take a "hard look" at the environmental

impacts of their actions.  42 U.S.C. § 4332(2)(C); *Robertson*, 490 U.S. at 349-50.  To satisfy the

hard look requirement, an EIS first must describe the existing environment that will be affected

by the proposal, in order to provide a baseline for comparison of alternatives.  40 C.F.R.

§ 1502.15.  The EIS then must analyze and disclose any significant impacts of the proposed

action and reasonable alternatives.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.14,

1502.16, 1508.25(b), 1508.8.  The agency must evaluate those impacts in context through a

"cumulative effects" analysis that addresses "the incremental impact of the action when added to

other past, present, and reasonably foreseeable future actions regardless of what agency (Federal

or non-Federal) or person undertakes such other actions."  40 C.F.R. §§ 1508.7, 1508.25(c).

"Cumulative impacts can result from individually minor but collectively significant actions

taking place over a period of time."  *Id.* § 1508.7.

BLM's failure to address OHV impacts in the context of climate change violated NEPA's

hard look mandate in at least two respects.  First, the agency did not address existing climate

change impacts as part of the environmental baseline, or "affected environment."  *See id.*

§ 1502.15; *Ctr. for Biological Diversity*, 422 F. Supp. 2d at 1163 (affected environment

30

discussion "sets the 'baseline' for the environmental analysis that is the heart of the EIS" and therefore must be "accurate and complete").  SUWA's comments identified numerous peer-reviewed studies and government reports documenting precipitous declines in precipitation and temperature increases throughout Utah and the Colorado Plateau as a result of climate change. AR SUPP004909-12.  It is also undisputed that the changing climate is already causing loss of riparian areas, accelerated rates of soil erosion, and more favorable conditions for exotic plant invasions and wildfires.  *Id.*; *see also, e.g.*, AR SUPP003221-22, 228-42 (U.S. Geological Survey reports detailing existing climate change impacts in the region).  Despite this evidence, BLM ignored existing climate change impacts in its discussion of the affected environment.  *See* AR SUPP007639-40 (PRMP at 3-3 to -4) (FEIS Ch. 3 boilerplate language only describing climate change as a global phenomenon with regional variations and mentions possible emission sources and sinks).  BLM's failure to address this important issue violates NEPA's requirement to describe the existing environment.

Second, BLM failed to analyze the cumulative impacts of its travel plan in combination with climate change.  SUWA provided BLM with credible scientific information showing that existing impacts from climate change are only expected to get worse.  *See* AR SUPP004909-12. As with the environmental baseline, BLM did not respond to that information.  The boilerplate language in Chapter 4 of the final EIS recognizes generally that "a warmer and drier climate" may result in "drier and less stable soils."  AR SUPP007808 (PRMP at 4-4).  But the agency made no attempt to analyze how climate change and the OHV use authorized in the travel plan will affect the particular resources at stake, such as soils, vegetation, and riparian areas.  In a warming climate, soil disturbing activities like OHV use have synergistic effects that further

31

degrade ecosystem resilience.  *See* AR SUPP004909-12.  For example, desert plant communities

are more vulnerable to disturbance from OHVs and invasion by exotic weeds that are better

adapted to the changing conditions than would be the case in a static climate.  *See, e.g.*, AR

SUPP003222, 3232, 4341-42.[18]

In fact, the agency's cumulative impacts analysis does not mention climate change *at all*.

*See* AR SUPP008396-412 (PRMP at 4-592 to -608).  That omission violated NEPA's mandate to

analyze the travel plan in the context of existing and reasonably foreseeable future impacts.  *See*

40 C.F.R. § 1508.7; *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538

F.3d 1172, 1216-17 (9th Cir. 2008) (agency required to address climate change as part of

cumulative effects analysis); *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1134 (9th

Cir. 2007) (cumulative effects analysis inadequate where it did not address impacts of project

when "added to the pre-existing deteriorated state" of the resources at stake).

BLM's omission of climate change from the environmental baseline and cumulative

effects analysis compromised the agency's ability to make an informed decision about how much

disturbance from OHVs the already-degraded ecosystem can withstand in these changing

climatic conditions—information that was critical to the agency's selection of an alternative.  *See*

40 C.F.R. §§ 1502.15, 1508.7; *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d

505, 510 (9th Cir. 1988) ("Without establishing the baseline conditions which exist [prior to the

proposed action] . . . , there is simply no way to determine what effect the proposed [action] will

---

[18] *See also* AR SUPP005624 (Environmental Protection Agency recommendations for increasing the resilience of ecosystems to climate change include reducing human-caused stressors that affect native vegetation); AR SUPP004344 (U.S. Climate Change Science Program report cautioning that "[t]he response of arid lands to . . . climate change is contingent upon" future land use practices, including human-caused disturbances like OHV use that "reinforce and accentuate climate effects").

have on the environment and, consequently, no way to comply with NEPA.").  For example,

with the benefit of more thorough analysis, BLM may have selected a travel plan alternative that

minimized surface disturbance from OHVs, rather than designating over 4,000 miles of routes.

### C.  BLM Cannot Rely on Uncertainty as an Excuse Not to Consider Available Information Regarding Climate Change

BLM claims that it did not need to provide a robust discussion of climate change because

it lacks the "scientific tools" to "quantify" climate change impacts on a regional or local scale.

AR SUPP007808 (PRMP at 4-4); *see also* AR SUPP009565; AR SUPP005560-61.  BLM's

inability to "quantify" climate change impacts, however, does not provide an excuse for failing

to consider those impacts at all.  *See Mid States Coal. for Progress v. Surface Transp. Bd.*, 345

F.3d 520, 549 (8th Cir. 2003) ("[W]hen the *nature* of the effect is reasonably foreseeable but its

*extent* is not . . . the agency may not simply ignore the effect."); *Natural Res. Def. Council v.

Kempthorne*, 506 F. Supp. 2d 322, 368 (E.D. Cal. 2007) (even where "the precise magnitude of

[climate change] remains uncertain, judgments about the likely range of impacts can and have

been made").  As courts have recognized, "because the cumulative effects analysis requires an

agency to predict future conditions, uncertainty is an inherent part of the process," and an agency

"may not rely on a statement of uncertainty to avoid even attempting the requisite analysis."

*Brong*, 492 F.3d at 1134; *see also Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*,

481 F.2d 1079, 1092 (D.C. Cir. 1973) ("reasonable forecasting and speculation is implicit in

NEPA").

In fact, SUWA provided BLM with numerous scientific studies describing the very

regional and local impacts that BLM claims are impossible to predict.  *See, e.g.*, AR

SUPP003221-24, 228-42.   For example, the U.S. Geological Survey expects the Colorado

Plateau will face particularly significant temperature increases and water scarcity as a result of climate change, which in turn will "decrease soil and ecosystem resilience to land-use impacts [from roads, OHVs, and other surface-disturbing activities], further increasing the frequency and magnitude of erosion." AR SUPP003222. Under NEPA, BLM cannot rely on a blanket assertion of uncertainty to avoid considering those impacts.[19]

## V.   The Richfield RMP Violates FLPMA Because It Does Not Ensure Compliance with Federal Air Quality Standards

FLPMA requires BLM to ensure that its land use plans "provide for compliance with applicable pollution control laws, including State and Federal air . . . pollution standards or implementation plans." 43 U.S.C. § 1712(c)(8).[20] BLM failed to comply with this legal obligation for the Richfield RMP and travel plan. The Richfield RMP shows that air pollution

---

[19] Finally, even to the extent that certain climate change impacts were too uncertain to quantify or predict, BLM was required to comply with NEPA's regulations governing "incomplete or unavailable information." 40 C.F.R. § 1502.22. Under these circumstances, the EIS must include, "a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts" and "the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." *Id.* § 1502.22(b). BLM did not include the required summary or evaluation in its RMP or otherwise make any attempt to satisfy the regulation's requirements. *See Mid States Coal. for Progress*, 345 F.3d at 550 (agency "completely ignored the effects of increased coal consumption" and "made no attempt to fulfill the requirements laid out in the [incomplete or unavailable information] regulations"); *Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 559-61 (9th Cir. 2011) (40 C.F.R. § 1502.22 required agency to assess the "reasonably foreseeable adverse impacts despite gaps in the relevant data"). Without this analysis, BLM cannot rely on a claim that the information was unavailable.

[20] Moreover, once a land use plan is in place, BLM must conform all site-specific authorizations, including those affecting air quality, with its land use plan. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004). BLM acknowledged these legal obligations in the Richfield RMP, stating that it would "manage all BLM and BLM-authorized activities to maintain air quality within the thresholds established by the [National Ambient Air Quality Standards]," and that it would "[m]aintain concentrations of . . . pollutants associated with management actions in compliance with applicable State and Federal Ambient Air Quality Standards." AR SUPP002267 (ROD at 70).

levels within the Richfield planning area likely already exceed federal and state air quality standards established to protect public health and welfare.  The RMP also confirms that activities authorized under the RMP, including OHV use under the travel plan, will increase these pollution levels.  Yet, BLM offers no explanation for how it will ensure compliance with the federal air quality standards given these conditions and thus its decision must be set aside.

### A.  The Richfield Planning Area Is Likely Exceeding Federal Air Quality Standards for Ozone and Fine Particulates

Under the Clean Air Act, the U.S. Environmental Protection Agency (EPA) establishes National Ambient Air Quality Standards (NAAQS) for certain pollutants that are designed to protect the public health and welfare.  *See* 42 U.S.C. §§ 7408, 7409.  Utah has incorporated the NAAQS into state law and implements the standards within the state, including the Richfield planning area.  *See, e.g.*, Utah Admin. Code R. 307-101-1 (2011).

EPA has established NAAQS for two pollutants that are relevant in this case: fine particulate matter, referred to as "$PM_{2.5}$"[21] and ground-level ozone.  *See, e.g.*, 40 C.F.R. § 50.13 ($PM_{2.5}$); *id.* § 50.15 (ozone).  Both short-term and long-term exposure to $PM_{2.5}$ can lead to premature mortality, increased hospital admissions, and chronic respiratory disease; these particles also create regional haze.  *See* 71 Fed. Reg. 2620, 2627-28, 2675-78 (Jan. 17, 2006). Ozone pollution is not emitted directly, but is formed from the combination of precursor emissions—principally volatile organic compounds and nitrogen oxides—and its concentrations are affected by temperature, sunlight, wind, and other weather factors.  *See* 73 Fed. Reg. 16,436, 16,437 (Mar. 27, 2008).  Ozone exposure can lead to adverse health effects ranging from decreased lung function to possible cardiovascular-related mortality and respiratory morbidity.

---

[21] This number refers to particles 2.5 microns in diameter or smaller.

*Id.* at 16,436.  Ozone pollution also contributes to plant and ecosystem damage.  *See, e.g.*, 72

Fed. Reg. 37,818, 37,883-95 (July 11, 2007).

The Richfield RMP indicates that the planning area is likely exceeding the federal limits

for both $PM_{2.5}$ and ozone.  *See* AR SUPP007644-46 (PRMP at 3-8 to -10).  NAAQS limit

ambient concentrations of $PM_{2.5}$ to 35 micrograms per cubic meter ($\mu g/m^3$) or less during any

24-hour averaging period.  40 C.F.R. § 50.13.[22]  The average of the relevant three years of

maximum 24-hour $PM_{2.5}$ levels was approximately 44 $\mu g/m^3$.  *See* AR SUPP007646 (PRMP at

3-10) (averaging values from 2005-07).[23]  Accordingly, as stated in the Richfield RMP, the

planning area is not complying with the 24-hour $PM_{2.5}$ limit.  AR SUPP007645 (PRMP at 3-9)

("The measured concentrations [of particulate matter] show compliance with ambient air quality

standards, except with the new 24 hour average $PM_{2.5}$ standard.").

NAAQS limits ozone concentrations to 0.075 parts per million (ppm) during any daily

eight-hour averaging period.  40 C.F.R. § 50.15.[24]  The Richfield RMP uses monitoring data for

ozone pollution from Zion National Park (located west of the planning area) and Canyonlands

National Park (located east of the planning area) to determine likely background concentrations

in the planning area.  *See* AR SUPP007645 (PRMP at 3-9).  The combined three-year average

for these national parks places ozone levels at approximately 0.076 ppm in this region.  *See* AR

---

[22] This 24-hour standard is met when the 98th percentile 24-hour concentration is less than or equal to 35 $\mu g/m^3$.  40 C.F.R. § 50.13.

[23] The three-year average for the most recent data provided in the Richfield RMP is presented only in bar chart form without specific numbers.  *See* AR SUPP007646 (PRMP at 3-10).  The numeric average of 44 $\mu g/m^3$ is a conservative approximation of the bar chart values.  *See id.*

[24] This standard is met when the three-year average of the annual fourth-highest daily maximum eight-hour average is less than or equal to 0.075 ppm.  *Id.* § 50.15.

SUPP005614 (SUWA Protest at 18), SUPP007645 (PRMP at 3-9).[25]  These elevated levels led

BLM to state that ozone pollution is "of critical concern."  AR SUPP008402 (PRMP 4-598).

### B. Activities Authorized by the RMP Will Contribute to the Existing Pollution Problems in the Richfield Planning Area

BLM recognizes that yearly pollution emissions from BLM-authorized activities will

nearly double from current levels under the Richfield RMP.  AR SUPP007815, 7823 (PRMP at

4-11, 4-19) (projecting an increase from 1,243 tons per year of various pollutants to 2,271 tons

per year by 2022).  The RMP also predicts that pollution from OHVs will increase from current

levels under the RMP.  *Compare* AR SUPP007811 (PRMP at 4-7) (2007 emission summary),

*with* AR SUPP007816 (PRMP at 4-12) (PRMP emission summary).

The Richfield RMP recognizes that OHVs will cause particulate matter pollution, both

from tailpipe emissions and fugitive dust created by their passage over dirt roads.  AR

SUPP007810 (PRMP at 4-6).  Fugitive dust from OHVs is a particular problem "in heavily used

---

[25] Although BLM did not calculate the three-year average necessary to determine compliance with the ozone NAAQS, SUWA determined this value based on the evidence in the administrative record.  *See* 40 C.F.R. § 50.15.  The Richfield RMP shows nine-years-worth of monitored ozone pollution values for Canyonlands National Park, but only two-years-worth of values from Zion National Park.  AR SUPP007644-45 (PRMP at 3-8 to -9).  For Zion National Park, BLM failed to include data from 2005 or earlier.  *See id.*  This oversight is significant because, as SUWA demonstrated to BLM during the planning process, ozone levels were particularly high in Zion National Park in 2005.  AR SUPP005614 (SUWA Protest at 18) (showing ozone measured at 0.091 ppm).  BLM's failure to consider this information confirming the planning area had ozone levels above the NAAQS limits is arbitrary and capricious and violates the APA.  *See, e.g.*, *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (agency action is arbitrary and capricious when agency "entirely failed to consider an important aspect of the problem" (internal quotations and citations omitted)).  When data from 2005 is included, the combined three-year average for Zion and Canyonlands national parks places ozone levels at approximately 0.076 ppm.  *See* AR SUPP005614 (SUWA Protest at 18), SUPP007645 (PRMP at 3-9).  As with $PM_{2.5}$ the ozone data is presented only in bar chart form, without specific numbers.  *See* AR SUPP007645-46 (PRMP at 3-9 to -10).  The numeric three-year average for ozone is a conservative approximation of the bar chart values.  *See id.*

areas during times of drought, when soil is drier and the potential to generate dust is greater."

AR SUPP007813 (PRMP at 4-9).  As discussed above, drier conditions are expected to occur

with more frequency within the Richfield planning area as a result of climate change.

The Richfield RMP also indicates that OHV use in the planning area will emit ozone

precursors, such as volatile organic compounds and nitrogen oxides.  AR SUPP007644,

SUPP007810 (PRMP at 3-8, 4-6).  In fact, for volatile organic compounds, the RMP predicted

that nearly 93 percent of all anticipated emissions from all development and use activities in the

Richfield planning area would come from OHV use.  *See* AR SUPP007816 (PRMP at 4-12)

(predicting 322 tons per year of volatile organic compounds from vehicle use on travel plan

routes compared to a total of 348 tons of volatile organic compounds expected from all activities

in the planning area).  An increase in ozone precursors is likely to lead to an increase in ozone

pollution in the planning area.  *See, e.g.*, AR SUPP007359-60, SUPP007367, SUPP007374.

### C. BLM Violated FLPMA by Failing to Demonstrate That the Richfield RMP Will Ensure Compliance with Federal and State Air Quality Standards for Fine Particulates and Ozone

With respect to $PM_{2.5}$, BLM concludes that "[g]iven the low ambient concentrations that

exist in the [Richfield planning area] for some pollutants, it is expected that the increase in

emissions of . . . $PM_{2.5}$ for the Proposed RMP would not cause concentrations to exceed NAAQS

or state ambient air quality standards."  *See* AR SUPP007815 (PRMP at 4-11).  BLM fails to

reconcile this claim with the fact that it has already disclosed $PM_{2.5}$ pollution levels to be above

NAAQS by a wide margin *and* projected increases in $PM_{2.5}$ pollution from activities authorized

under the RMP, including OHVs.  *See* AR SUPP007645, SUPP007815-16 (PRMP at 3-9, 4-11

to -12).  In fact, the RMP's impact analysis fails to even discuss the elevated background levels

of $PM_{2.5}$.  *See, e.g.,* AR SUPP007815-17 (PRMP at 4-11 to -13).  Because the BLM's conclusion

for $PM_{2.5}$ pollution is unsupported and conflicts with relevant evidence in the Richfield RMP, it

is arbitrary and capricious and should be set aside.  *See Utah Envtl. Cong. v. Richmond*, 483 F.3d

1127, 1134 (10th Cir. 2007).

  In contrast with $PM_{2.5}$, BLM does not even assert that the Richfield RMP will comply

with the ozone NAAQS.  *See* AR SUPP007815 (PRMP at 4-11) (concluding that the RMP will

not cause exceedances for all NAAQS pollutants other than ozone).  Nor would the record

support that conclusion.  The RMP acknowledges that ozone pollution is of "critical concern"

given the elevated ozone levels in Zion and Canyonlands national parks.  AR SUPP008402

(PRMP 4-598).  Additionally, the RMP discloses that ozone precursors, including volatile

organic compounds and nitrogen oxides, will increase under the RMP.  AR SUPP007816 (PRMP

at 4-12).  However, the RMP lacks any discussion of how these increases will affect ozone

pollution in the planning area.  *See* AR SUPP007815-17 (PRMP at 4-11 to -13); AR

SUPP009518 (indicating that BLM was in "discussions" about possibly conducting ozone

analysis in the future).  Thus, aside from flagging ozone pollution as a problem in the area, BLM

failed to undertake any sort of quantitative or qualitative analysis of how permitted activities

would impact ozone pollution levels.  Absent such analysis, BLM has not met its obligation

under FLPMA to ensure compliance with the NAAQS.

## VI. BLM Violated FLPMA by Failing to Prioritize the Designation of Areas of Critical Environmental Concern

  FLPMA's criteria for the development of land use plans require BLM to "*give priority* to

the designation and protection of areas of critical environmental concern" (ACECs).  43 U.S.C.

§ 1712(c)(3) (emphasis added); *see also* AR 017249 (BLM Manual 1613.06) (BLM must "give

precedence to the identification, evaluation, and designation" of ACECs).  ACECs are "areas within the public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes."  43 U.S.C. § 1702(a).  A potential ACEC must have: (1) "relevance," meaning it possesses "a significant historic, cultural, or scenic value [or] a fish or wildlife resource or other natural system or process," and (2) "importance," meaning the relevant values, resources, or processes have "substantial significance."  43 C.F.R. § 1610.7-2(a); *see also* AR 017250 (BLM Manual 1613.11).  No other designation or land use is afforded such "priority" under FLPMA's planning requirements.  *See* 43 U.S.C. § 1712(c).  This prioritization reflects Congress' intent to elevate the designation and protection of ACECs over BLM's default management for "multiple use[s]."  *See id.* § 1732(a).[26]

BLM failed to comply with FLPMA's mandate to prioritize designation of ACECs in the Richfield RMP.  Prior to adoption of the Richfield RMP, BLM had previously designated four ACECs totaling 14,780 acres.  AR SUPP008604 (PRMP at A1-2).  BLM determined in the Richfield RMP planning process that an additional sixteen areas totaling 886,810 acres met the relevance and importance criteria for designation as ACECs.  AR SUPP008608-09 (PRMP at A1-6 to -7).  These potential ACECs include many exceptional natural resources, including what one senior research geologist concludes "may very well be the best-developed badlands

---

[26] *See* Jamison E. Colburn, *Habitat and Humanity: Public Lands Law in the Age of Ecology*, 39 Ariz. St. L.J. 145, 191 n.205 (2007) ("ACECs are . . . just another mechanism segregating a type of dominant use out of the BLM's baseline "multiple use" within its land management plans.") (citation omitted); Debra L. Donahue, *Federal Rangeland Policy: Perverting Law and Jeopardizing Ecosystem Services*, 22 J. Land Use & Envtl. L. 299, 337 (2007) (explaining that "FLPMA's ACEC provisions reveal an overriding congressional concern for protecting the ecological health and amenity values of public lands").

[geological formations caused by wind erosion] on the North America[n] continent." *See* AR 017703-04 (describing Badlands Potential ACEC).  Of the more than 900,000 acres encompassing twenty existing and potential ACECs, however, BLM designated only two ACECs covering just 2,530 acres.  AR SUPP002231 (ROD at 36); *compare* AR SUPP009053 (PRMP Map 2-46) (depicting potential ACECs), *with* AR SUPP002762 (ROD Map 28) (depicting ACECs designated in the Richfield RMP).  BLM's decision—which dramatically cut the acreage of existing ACECs and designated less than 0.3 percent of the total acreage satisfying the relevance and importance criteria—violated FLPMA's mandate to give priority to the designation of ACECs.  Indeed, BLM offered no explanation for how these minimal designations met its FLPMA obligation.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("[T]he agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (quotations and citations omitted)).

Instead of elevating the designation of ACECs over other uses, BLM refused to designate 99.7 percent of lands with relevant and important values because of other competing uses.  BLM rationalized its failure to designate the vast majority of these lands by claiming that "standard management" under the RMP would provide adequate protection.  *See* AR SUPP002231 (ROD at 36).  However, that conclusion is contrary to the record, which shows that OHV use, along with other activities authorized under the RMP, will cause ongoing and significant damage to those relevant and important values.

For example, the nearly 90,000-acre Badlands Potential ACEC encompasses the previously designated North and South Caineville Mesa and Gilbert Badlands ACECs as well as the iconic Factory Butte.  AR SUPP008610 (PRMP at A1-8); AR SUPP002232 (ROD at 37).

The area's relevant and important values include breathtakingly unusual scenery, unique badlands geology caused by wind erosion, and endangered plant species.  AR SUPP008250, 8610 (PRMP at 4-446, A1-8); AR SUPP002232 (ROD at 37); *see also* AR 020483-84 ("The area exposes a spectacular sequence of upper Mancos Shale in beautiful badland topography.").  The Badlands landscapes, however, are "highly sensitive to surface disturbance" from OHVs due to "[t]heir impermeable, easily eroded substrate . . . , thin soils, steep slopes, and lack of vegetation."  AR 017704 (senior research geologist describing why "surface disturbance must be minimized if the . . . [B]adlands are to be preserved").[27]

Despite the Badlands' sensitivity to disturbance from OHVs, the travel plan opens 8,000 acres of the potential ACEC to cross-country OHV use, plus another 36,000 acres to OHV travel on designated routes.  AR SUPP008253, 8258 (PRMP at 4-449, 4-454).  BLM acknowledged that "[t]he demand for specialized OHV recreation opportunities available at this site . . . were considered when making th[e] decision" not to designate the Badlands Potential ACEC.  AR SUPP008611 (PRMP at A1-9).  By elevating OHV interests over special management necessary to protect the area's relevant and important values, BLM ignored FLPMA's mandate to prioritize ACEC designation.

Furthermore, BLM's claim that special management is not necessary is not supported by the record.  As BLM itself recognized in its 2005 ACEC Evaluation Report, allowing open, cross-country OHV use could cause irreparable damage to the area's badlands topography, listed

---

[27] Indeed, in 1986 BLM determined that 3,680 acres of these badlands required special management attention to prevent irreparable damage.  *See* AR 020030-31 (1986 Environmental Assessment for Gilbert Badlands ACEC included closing the area to OHV use).  The Richfield RMP did not carry forward those and other special management protections.  *See* AR SUPP002232 (ROD at 37) (Badlands Potential ACEC includes two existing ACECs not designated in the Richfield RMP).

species of cacti, and scenic values.  AR 017395 (ACEC Evaluation Report, Att. 3 at 2) (recommending that the area be closed to OHV use or OHVs be limited to designated trails to prevent irreparable harm); *see also* AR SUPP008250 (PRMP at 4-446) (BLM acknowledging that "ground disturbance associated with cross-country OHV use" could threaten cacti and scenic values with irreparable damage); AR 019172 ("Surveys conducted [in the Factory Butte area] have noted mortality to threatened and endangered plant populations from cross-country OHV use.").  Despite the clear threat posed by OHVs, BLM determined that the area's relevant and important values would be adequately protected under the RMP's travel plan.  *See* AR SUPP008610 (PRMP at A1-8).  As discussed above, however, in developing the travel plan, BLM failed to comply with its own regulations requiring that it minimize impacts to wildlife and soils, among other resources.  *See supra* at 7-14.  Accordingly, the travel plan provides no support for BLM's claim that the Badlands Potential ACEC is adequately protected.

BLM also disregarded damage from OHVs in the 205,300-acre Dirty Devil Potential ACEC, which encompasses the Dirty Devil River and its numerous serpentine side canyons.  AR SUPP008611 (PRMP at A1-9).  The area boasts unparalleled scenery, important cultural and paleontological resources, and habitat for bighorn sheep and the endangered Mexican spotted owl.  *Id.*; AR SUPP002233-34 (ROD at 38-39); AR SUPP008266 (PRMP at 4-462).  BLM admits that OHV use "could adversely impact the scenic, cultural, wildlife, and [endangered species] values."  AR SUPP008266 (PRMP at 4-462) (explaining that "[p]lants could be crushed, damaged, or destroyed; cultural resources could be damaged or destroyed; [] new trails could be established in scenic areas[; and] OHV use could also disturb Desert bighorn sheep and special status animal species").  Yet instead of protecting those values by closing the area to OHVs,

BLM designated approximately eighty-seven miles of OHV routes traversing nearly half of the

potential ACEC.  *See* AR SUPP008268-69 (PRMP at 4-464 to -65); Decl. of Ray Bloxham ¶ 31;

*compare* AR SUPP008274 (PRMP at 4-470) (proposed RMP), *with* AR SUPP008277 (PRMP at

4-473) (ACEC designation in alternative C would "eliminate[]" OHV impacts to relevant and

important values by closing the area).  As with the Badlands Potential ACEC, BLM's conclusion

that its travel plan will adequately protect the Dirty Devil Potential ACEC is unsupported

because BLM failed to ensure that the travel plan would minimize adverse impacts to wildlife,

vegetation, and cultural resources.  Moreover, BLM also failed to take into account impacts of

the travel plan to cultural resources under the NHPA.  *See supra* at 21-27.

 BLM also violated FLPMA by, BLM elevated coal resource development—which

threatens, rather than protects, the relevant and important values—above special management for

the Henry Mountains Potential ACEC.  *See* AR SUPP008611 (PRMP at A1-9).  This vast and

remote, 288,200-acre area includes exceptional scenery, bison herds, mule deer, threatened and

endangered species, and riparian and relict vegetation.  *Id.*; AR SUPP002235 (ROD at 40); AR

SUPP008288 (PRMP at 4-484).  The area also includes substantial coal reserves.  *See* AR

SUPP008297 (PRMP at 4-493).  BLM admits that mining these reserves would cause irreparable

harm to all the relevant and important values in the area.  *Id.* Yet, instead of prescribing special

management to protect the area's scenery, wildlife, and vegetation from irreparable damage, the

RMP made fifty-five percent of the potential ACEC available for coal leasing and development.

By contrast, ACEC designation would have closed the area to coal leasing and development,

thereby "eliminating the potential for impacts to relevant and important values."  *See* AR

SUPP008300-01 (PRMP at 4-496 to -97).[28]  As with OHVs in other potential ACECs, BLM

elevated coal resource development in the Henry Mountains Potential ACEC above special

management to protect relevant and important values, in violation of FLPMA.[29]

### VII.  BLM Violated the Wild and Scenic Rivers Act by Eliminating Eligible River Segments Based on Their Ephemeral Flows

#### A.  Wild & Scenic Rivers in the Richfield Planning Area

Numerous remote desert streams wind their way through the canyons of the Richfield

planning area.  For example, the famed Dirty Devil and its tributaries boast spectacular scenery,

unique geography, critical riparian wildlife habitat, important archeological sites, and

unparalleled opportunities for slot canyoneering and other primitive recreation.  *See* AR 044634-

37; AR SUPP002387-2402 (ROD at A1-4 to -19); AR 015357-62; AR 014827-32, 14839-40;

AR 015407-11.  As is common throughout Utah's desert ecosystems, many of these streams do

---

[28] The preferred alternative in the draft RMP and EIS originally included designating the Henry Mountain ACEC, along with all four existing ACECs.  *See* AR 007281; AR 2002168.  Following intense opposition from the local counties, however, BLM's Director in Washington instructed that the "big ACEC," referring to the Henry Mountains potential ACEC, as well as three of the four existing ACECs, be removed from the preferred alternative.  *See, e.g.*, AR 007281; AR 2002168; AR 006862-63; AR 007293; AR 007319-20; AR 007329-30; AR 008392.  This "management direction" from Washington appears to have been prompted in part by concerns about closing the area to coal leasing and development.  *See* AR 007281; AR 2000937 (state agency voicing concern over Henry Mountains Potential ACEC due to the "large coal reserves" in the area).

[29] As it did with the Badlands and Dirty Devil Potential ACECs, the BLM acknowledged that the Henry Mountains Potential ACEC's relevant and important values would be harmed by OHV use, though alleged that by limiting OHV use to designated trails those impacts would be reduced.  *See* AR SUPP008291, 8297 (PRMP at 4-487, 4-493).  BLM designated a significant number of miles of trails—approximately 315 miles—within the Henry Mountains Potential ACEC.  Decl. of Ray Bloxham ¶ 31.  Because BLM failed to comply with both FLPMA's minimization criteria and the NHPA, any purported benefit from limiting OHVs to designated trails was illusory.  *See supra* at 7-14, 21-27.

not flow year-round, but still provide extraordinary natural values.  *See* AR 014853; AR 014909; AR 015432; AR 015434.

Congress enacted the Wild and Scenic Rivers Act in 1968 to protect "free-flowing" rivers and streams with "outstandingly remarkable . . . values . . . for the benefit and enjoyment of present and future generations."  16 U.S.C. § 1271.  As part of the RMP planning process, the Wild and Scenic Rivers Act requires BLM to employ a two-step process to evaluate whether rivers within the planning area qualify as potential wild and scenic rivers.  *Id.* § 1276(d)(1); *see also* BLM Manual § 8351.06 (attached as Ex. 5).  First, BLM must determine which river segments are "eligible" for inclusion in the National Wild and Scenic Rivers System.  16 U.S.C. § 1273(b).  Second, BLM determines which eligible segments are "suitable" for wild and scenic designation and recommends them to Congress.  *Id.* §§ 1273(a), 1275(a).[30]  BLM must manage eligible and suitable rivers to protect their free-flowing nature and outstandingly remarkable values.  *Id.* § 1283(a); BLM Manual §§ 8351.06(D), .32(C), .52(C), .53(B).

Despite the wealth of desert streams with "outstandingly remarkable values" among the 304 drainages BLM inventoried as part of the Richfield RMP process, the agency determined that only twelve segments totaling 135 miles were "eligible" for inclusion in the National Wild and Scenic Rivers System.  AR 044631-32; AR SUPP007756-57 (PRMP at 3-120 to -121).  BLM disqualified numerous river segments based solely on the ephemeral nature of their flows.  *See* AR 044633-35, 044639.  Of the twelve streams BLM determined were eligible, BLM

[30] Congress or state legislatures may designate rivers into the National Wild and Scenic River System, thereby affording permanent protection for their free-flowing nature and outstandingly remarkable values.  16 U.S.C. § 1273(a).

determined that only a single, five-mile section of the Fremont River was "suitable" for wild and

scenic designation.  AR SUPP002243, 2384 (ROD at 48, A1-1).

**B.  BLM's Eligibility Determination Violates the Wild and Scenic Rivers Act**

The Wild and Scenic Rivers Act casts a wide net for determining whether a river is

"eligible" for consideration.  The Act requires that "[e]very wild, scenic or recreational river in

its free-flowing condition, or upon restoration to this condition, shall be considered eligible."  16

U.S.C. § 1273(b).  Accordingly, a river segment is "eligible" if it is: (1) "free-flowing," and (2)

"wild, scenic or recreational," meaning it possesses one or more "outstandingly remarkable

scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values."  *Id.*

§§ 1271, 1273(b).  BLM guidance instructs that "[n]o other factors are considered in determining

the eligibility of a river segment."  BLM Manual § 8351.31(A).  The dispute here involves the

first criterion: whether a river is "free-flowing."

The Wild and Scenic Rivers Act defines "free-flowing" as "existing or flowing *in natural

condition* without impoundment, diversion, straightening, rip-rapping, or other modification of

the waterway."  16 U.S.C. § 1286(b) (emphasis added).  Under this definition, a river is free-

flowing in the absence of "man-made barricades."  AR 015342.  As BLM guidance

demonstrates, the Act imposes no minimum flow requirement for a river to be free-flowing:

> A river need not be "boatable or floatable" in order to be eligible. . . .  [T]he
> volume of flow is sufficient if it is enough to maintain the outstandingly
> remarkable values identified within the segment.  Rivers with intermittent flows
> exist within the [National Wild and Scenic River System], and rivers
> representative of desert ecosystems having outstanding ecological or other values,
> should be considered.

BLM Manual § 8351.31(B)(1); *see also* AR 015128 (inter-agency guidance stating that "[r]ivers

with intermittent or non-perennial flows exist within the National System and may be

representative of rivers within particular physiographic regions").  The flows must simply be

sufficient to maintain the outstandingly remarkable values of the river.

Despite the plain language of the Act and BLM's own guidance, BLM disqualified

otherwise-eligible river segments solely because their flows are ephemeral.  *See* AR 044633-35,

044639.  BLM had determined in its preliminary eligibility report that nearly 200 ephemeral

streams, including eight with potential outstandingly remarkable values, were free-flowing.  *See*

AR SUP009624-39.[31]  But in its final decision, BLM reversed course and rejected five

ephemeral stream segments that it recognized as having outstandingly remarkable values,

including Happy Canyon, Big Hollow, Fiddler Cove Canyon, Horseshoe Canyon, and Buck and

Pasture Canyons.  *See* AR 044633-35, 044639.  BLM based its decision on an Instruction

Memorandum (IM) issued by the BLM's Director of the National Landscape Conservation

System during the RMP process.  AR 044632-35, 044639; AR 044649-50 (IM 2004-196); AR

015304-06 (request for guidance).  The IM provides:

> As a general rule, the segment should contain regular and predictable flows (even
> though intermittent, seasonal, or interrupted). . . .  Caution is advised in applying
> the free-flow criterion to water courses that only flow during flash floods or
> unpredictable events.  The segment should not be ephemeral (flow lasting only
> few days out of a year).

AR 044649.

BLM's determination, based on the IM, that ephemeral streams in the Richfield planning

area are per se ineligible is contrary to the Wild and Scenic Rivers Act broad definition of free-

---

[31] BLM defined ephemeral streams as "[d]ry wash[es] [with] flowing water only during or
immediately after a storm with little or no evidence of riparian vegetation."  AR SUPP009639.
By contrast, it defined intermittent streams as having "[f]lowing water in at least part of the
segment most of the year and evidence of riparian vegetation."  *Id.*  Perennial streams are those
with "[f]lowing water through most of the segment most of the year and evidence of riparian
vegetation."  *Id.*

flowing. The excluded stream segments "exist[] or flow[] in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." *See* 16 U.S.C. § 1286(b). Furthermore, as BLM has recognized, although the flows are ephemeral, they are sufficient to support the outstanding and remarkable values of these rivers. *See* AR 044633-35, 044639. For example, BLM excluded the Dirty Devil tributary, Happy Canyon, which boasts numerous perennial springs that provide water sources for mammals and reptiles and deep, narrow gorges "replete with small pour-offs, large potholes, and green riparian habitat." AR 015360. Yet BLM downgraded Happy Canyon from eligible to ineligible even though year-round flows are not necessary to maintain its scenic, recreation, and other values. *Compare* AR SUPP009616 (Preliminary Report), *with* AR 044635 (Eligibility Report). This decision violates the plain language of the Wild and Scenic Rivers Act.

BLM's position on ephemeral streams is also arbitrary because it represents an unexplained change in the agency's long-standing position. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42, 46-57; *Immigration & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (agency interpretation that conflicts with prior interpretation entitled to less deference); *Qwest Corp. v. F.C.C.*, 689 F.3d 1214, 1228 (10th Cir. 2012) (compiling cases finding agency's sudden or unexplained shift in position arbitrary and capricious). BLM and other federal agencies have previously found intermittent or ephemeral desert streams to be eligible for wild and scenic designation. *See, e.g.*, AR 2037468-69 (discussing BLM findings in Arizona, Wyoming, Oregon, and Utah; National Park Service findings; and U.S. Forest Service findings that intermittent streams are eligible); AR 015397 (California BLM office finding Death

Valley stream that only flows during floods eligible).[32]

BLM's prior interpretation of the Act was also evident at the beginning of the Richfield planning process; the agency initially determined that hundreds of ephemeral streams met the definition of free-flowing.  *See* AR SUPP009624-39.  In fact, early in the planning process, BLM's Washington Office warned Utah BLM planners that, "[i]f you focus on dry washes as an automatic disqualifying factor, I can guarantee problems with this interpretation of the [Wild and Scenic Rivers Act]."  AR 014870.  Similarly, the State Office cautioned Field Office planners that, "[a]lmost everything is free-flowing," and even "dry washes would be value[d]."  AR 015342; *see also* AR 004212 (National Park Service comments on the draft RMP that "ephemeral flows do not preclude eligibility").  Although the IM represented a dramatic change in BLM's position, the agency provided no rationale for this change in violation of the APA. *See, e.g.*, AR 044633-35, 044639 (Eligibility Report rejecting ephemeral streams "per IM-2004-196"); AR 044649 (IM providing no reasoned analysis of why ephemeral streams no longer qualify as free-flowing).

## CONCLUSION

Based on the foregoing, SUWA respectfully requests that the Court overturn the BLM's Richfield RMP and travel plan and require the agency to revisit its decisions therein.

---

[32] Congress has designated some of those streams into the National Wild and Scenic River System.  *See, e.g.*, Omnibus Oregon Wild and Scenic Rivers Act, Pub. L. No. 100-557, 102 Stat. 2782 (1988); AR 2037469.

Respectfully submitted December 20, 2012.

/s/ Stephen H.M. Bloch
Stephen H.M. Bloch                              Robin Cooley
David Garbett                                   Alison Flint
                                                Heidi McIntosh
Robert Wiygul

Attorneys for Plaintiff
Southern Utah Wilderness Alliance *et al.*