## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**MARCILYNN BURKE, et al.,**<br><br>Defendants,<br><br>**ENDURING RESOURCES, et al.,**<br><br>Intervenors-Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Consolidated Case No. 2:12CV257DAK<br><br>Judge Dale A. Kimball |
| **SOUTHERN UTAH WILDERNESS ALLIANCE, et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,**<br><br>Defendants,<br><br>**KANE COUNTY, UTAH, et al.,**<br><br>Intervenors-Defendants. | |

This matter is before the court on Plaintiffs Southern Utah Wilderness Alliance, Natural

Resources Defense Council, Wilderness Society, National Parks Conservation Association,

Grand Canyon Trust, Sierra Club, National Trust for Historic Preservation, Center for Native Ecosystems, Utah Rivers Council, and Great Old Broads for Wilderness's challenge to the Bureau of Land Management's ("BLM") Richfield Resource Management Plan ("RMP") and Travel Plan.  On July 2, 2013, the court held a hearing on the matter.  At the hearing, Plaintiffs were represented by Stephen H.M. Bloch, David T. Garbett, Robin Cooley, and Heidi J. McIntosh, the BLM Defendants were represented by Michael Thorpe, Intervenors-Defendants Trails Preservation Alliance, Colorado Off Highway Vehicle Coalition, and Blue Ribbon Coalition were represented Paul A. Turcke, Intervenor-Defendant XTO Energy was represented by William E. Sparks, Intervenor-Defendant Enduring Resources II was represented by Kathleen Corr Schroder, Intervenors-Defendants State of Utah, Carbon County, Uintah County, Duchesne County, Daggett County, Emery County, and Grand County were represented by Kathy Davis, Intervenor-Defendant San Juan County was represented by Shawn T. Welch, and Intervenor-Defendant SITLA was represented by Thomas Mitchell.  The court took the matter under advisement.  Having fully considered the briefs submitted by the parties, the administrative record, and the relevant facts and law, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Before the court is an appeal of the BLM's 2008 Richfield RMP and Travel Plan.  The Federal Land Policy and Management Act ("FLPMA") directs the BLM to prepare land use plans to govern the management of public lands.  *See* 43 U.S.C. § 1712(a).  FLPMA requires the BLM to manage public lands "under principles of multiple use and sustained yield" and "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and

2

atmospheric, water resource, and archaeological values." *Id.* § 1732(a), § 1701 (a)(8).  FLPMA also requires the BLM to "develop, maintain, and, when appropriate, revise land use plans" to govern its management of the public lands.  43 U.S.C. § 1712(a).  Accordingly, the BLM is charged with implementing planning decisions that balance various interests and uses.

"'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put."  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004).  "Sustained yield" refers to the BLM's duty "to control depleting uses over time, so as to ensure a high level of valuable uses in the future." *Id.*

The 2008 Richfield RMP governs the management of 2.1 million acres of BLM land in south-central Utah, most of which is located between Capitol Reef National Park, Canyonlands National Park,  and the Glen Canyon National Recreation Area.  The area includes the Henry Mountains and the Dirty Devil region.  The BLM has recognized that more than half of the 2.1 million acres in the planning area are "wilderness-quality" lands, meaning that they are natural areas with "outstanding opportunities for solitude or primitive and unconfined recreation."  The area also contains thousands of archaeological sites.

The BLM conducted public scoping for the Richfield RMP in 2002 and released its draft RMP ("DRMP") and environmental impact statement ("EIS") in October 2007.  The proposed RMP and final EIS followed in August 2008.  After resolving all protests, the BLM issued its Record of Decision ("ROD") and Approved RMP on October 31, 2008.  The ROD approves final BLM decisions regarding off-highway vehicles ("OHVs"), areas of critical environmental concern ("ACECs"), and wild and scenic rivers.

In each land use plan it prepares, the BLM must consider OHV use as one of the multiple uses and designate all public lands covered by the plan as either open, limited, or closed to OHV use.  43 C.F.R. Subpart 8340, 8342.  Accordingly, the ROD in this case designates lands within the planning area as open, closed, or limited.  Within the 9,980 acres designated as open, OHVs can drive anywhere.  No OHV can travel in the 209,900 acres designated as closed.  And, within the 1.9 million acres designated as limited, OHVs may only drive on designated routes.  Within the 1.9 million limited use acres, the ROD approves the BLM's final decision to designate 4,277 miles of dirt roads and trails crossing the area.  The BLM also authorized vehicles to be driven and parked anywhere up to fifty feet on either side of the designated routes and up to 150 feet on either side of routes leading to existing campsites.  The route designations are known as the "Travel Plan."

Prior to finalization of the Travel Plan, the majority of the Richfield planning area was open to cross-country travel and generally lacked designated routes.  Leading up to the planning process, OHV use significantly increased within the planning area.  The result was a network of user-created routes.  The Travel Plan formalized these user-created routes by officially designating them for OHV use.

The ROD also approves final designation of two ACECs totaling 2,530 acres.  Prior to adoption of the Richfield RMP, the planning area included four ACECs, totaling 14,780 acres. BLM designated these ACECs to protect important values, such as unique badland topography and relict vegetation.  During the planning process, the BLM studied an additional sixteen areas totaling 886,810 acres that had important resource values.  However, of the more than 900,000 acres of potential and existing ACECs, the BLM ultimately designated only 2 ACECs, consisting

of 2,530 acres.

The ROD also includes recommendations for Congress to designate one river segment, the Fremont Gorge on the Fremont River, for consideration as a "wild and scenic river" under the Wild and Scenic Rivers Act. There are numerous desert streams that wind their way through the canyons of the Richfield planning area, including the Dirty Devil and its tributaries. The BLM sought instruction from the BLM national office with respect to the designation of intermittent and ephemeral streams. After receiving an instruction memorandum from the national office, the BLM excluded most of the desert streams that were under consideration based on its definition of ephemeral. Therefore, the desert streams were considered ineligible as wild and scenic rivers based on their ephemeral flows.

## STANDARD OF REVIEW

Under Section 704 of the APA, this court has jurisdiction to review "final agency action." 5 U.S.C. § 704. The final agency action at issue in this case is the BLM's ROD approving the Richfield RMP and Travel Plan. Under Section 706 of the APA, this court must determine whether the BLM's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Utah Environmental Congress v. Zeiroth*, 190 F. Supp. 2d 1265, 1267-68 (D. Utah 2002). In applying the arbitrary and capricious standard, this court must determine whether the "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). An "agency's decision is entitled to a presumption of regularity." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).

5

**DISCUSSION**

Plaintiffs allege that the BLM violated several laws when it finalized the Richfield RMP and Travel Plan. Specifically, Plaintiffs contend: (1) the BLM violated its own OHV minimization criteria by authorizing OHV routes without minimizing the impacts on soils, vegetation, wildlife, air, water, and cultural resources, 43 C.F.R. § 8342.1(a)-(c); (2) the BLM violated the National Environmental Policy Act ("NEPA") by failing to take a "hard look" at the environmental impacts of OHVs, 42 U.S.C. § 4332(2)(c); (3) the BLM violated the National Historic Preservation Act ("NHPA") by failing to take into account the impact of OHV routes on archeological sites, 16 U.S.C. § 470f; (4) the BLM violated Secretarial Order 3226 and NEPA by failing to consider OHV damage in the context of climate change; (5) the BLM violated FLPMA by failing to ensure compliance with federal and state air quality standards, 43 U.S.C. § 1712(c)(8); (6) the BLM violated FLPMA by failing to prioritize designation of ACECs, *id.* § 1712(c)(3); and (7) the BLM violated the Wild and Scenic Rivers Act by eliminating streams from consideration based on its new definition of ephemeral flows, 16 U.S.C. §§ 1273(b), 1286(b).

**1. Minimization Criteria**

Plaintiffs argue that the BLM failed to apply the required minimization criteria in its preparation of the Travel Plan. BLM regulations require the BLM to minimize the impacts of designated routes on resources such as soils, watersheds, vegetation, air, wildlife, and cultural resources. 43 C.F.R. § 8342.1(a)-(c). However, Plaintiffs contend that the BLM's decision documents identify only general impacts that may occur and include no discussion or analysis of the specific impacts the designated routes will have to any of the resources identified in the

regulations.

In 1978, the BLM promulgated 43 C.F.R. § 8342.1, which governs the opening of OHV

routes within public lands.  The regulation provides:

> The authorized officer shall designate all public lands as either
> open, limited, or closed to off-road vehicles.  All designations shall
> be based on the protection of the resources of the public lands, the
> promotion of the safety of all the users of the public lands, and the
> minimization of conflicts among various uses of the public lands;
> and in accordance with the following criteria:
>
> (a) Areas and trails shall be located to minimize damage to soil,
> watershed, vegetation, air, or other resources of the public lands,
> and to prevent impairment of wilderness suitability.
>
> (b) Areas and trails shall be located to minimize harassment of
> wildlife or significant disruption of wildlife habitats.  Special
> attention will be given to protect endangered or threatened species
> and their habitats.
>
> (c) Areas and trails shall be located to minimize conflicts between
> off-road vehicle use and other existing or proposed recreational
> uses of the same or neighboring public lands, and to ensure the
> compatibility of such uses with existing conditions in populated
> areas, taking into account noise and other factors.

43 C.F.R. § 8342.1(a)-(c).  These criteria are referred to as the "minimization criteria."

Several courts have recognized that the BLM must apply the minimization criteria when

designating routes and provide a discussion of the basis for the conclusion that the route

designations at issue minimize impacts in accordance with the regulation.  *See, e.g., Wildlands

CPR, Inc. v. United States Forest* Serv., (D. Mont. 2012); *Idaho Conservation League v.

Guzman*, 766 F. Supp. 2d 1056, 1068 (D. Idaho 2011); *Ctr. for Biological Diversity v. Bureau of

Land Mgmt.*, 746 F. Supp. 2d 1055, 1080 (N.D. Cal. 2009).

In designating 4,277 miles of routes in this case, the BLM did not discuss the

minimization criteria in the ROD, RMP, or any other travel planning documents.

Acknowledging the minimization standards is not the same as applying them.  In fact, with

respect to impacts to soil, watershed, vegetation, air, and cultural resources, the ROD states that

the BLM decided to "[d]esignate routes for motorized use unless significant, undue damage to or

disturbance of the soil, wildlife habitat, improvements, cultural or vegetative resources, or other

authorized uses of the public land is imminent."  ROD at 125.  Allowing routes unless

"significant, undue damage" was "imminent" is not the standard required by the minimization

criteria.  Therefore, there is no evidence in the ROD that the minimization criteria was applied or

applied correctly.

Appendix 9 to the RMP, entitled "Travel Management/Route Designation Process,"

contains the BLM's specific designations of routes for OHV use.  The document states that the

BLM and county employees who worked on the route designations would "[d]esignate existing

routes for motorized use unless closed or restricted . . . as appropriate to address specific resource

concerns."  PRMP at A9-1.  The specific minimization criteria is not listed.  And, although

Appendix 9 states that various factors were considered, it provides no information about how

those factors were used to designate routes or minimize impacts to those resources.  As the

BLM's sole discussion of how it designated motorized routes, the Appendix fails to provide any

kind of analysis or explanation with respect to the requirement to minimize impacts.

The analysis of the minimization criteria must take place at the route specific level, not at

some general sense.  *Wildlands CPR*, 2012 WL 1072351, at *14.  In this case, the cryptic

spreadsheet for each route segment provides inadequate information standing alone and is not

discussed or elaborated upon anywhere in the decision documents.  There is no way to know how

8

the BLM used or considered the information it listed on the spreadsheet.  Contrary to the BLM's

assertion, this is not a case where there appears to be a mere disagreement about which routes

were chosen.  Rather, the case represents a failure to provide enough information or analysis for

someone other than the BLM to know why or how the routes were chosen.

The BLM argues that it complied with the minimization criteria because it closed 345

miles of routes and seasonally closed or imposed width restrictions on 538 miles of routes.

However, the discussion of closing these routes does not explain why they were closed or that the

closures were to minimize impacts.  There is no application of the minimization criteria in

connection with the route closures.  In addition, the mere fact that there were some route closures

does not demonstrate that the minimization criteria was applied.  "'Minimize' as used in the

regulation does not refer to the number of routes, nor their overall mileage.  It refers to the effects

of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage'

to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize

'conflicts' of uses.  Thus, simply because the BLM closed . . . routes evaluated does not, on its

own, compel the conclusion that the minimization criteria were applied." *Ctr. for Biological*

*Diversity*, 746 F. Supp. 2d at 1080-81.

The court has reviewed other cases addressing the same issue as is present in this case.

Other courts have found efforts by agencies that provided more information and more analysis of

the minimization criteria than was done in this case to be insufficient.  *See, e.g., Ctr. for*

*Biological Diversity*, 746 F. Supp. 2d at 1078-79; *Idaho Conservation League*, 766 F. Supp. 2d

at 1071-72.  The cases are directly on point and are persuasive to this court.  In this case, because

there is no indication that the BLM actually considered or applied the minimization criteria to the

designation of OHV routes, the BLM has failed to meet its regulatory requirements to implement

the minimization criteria by examining "the relevant data and articulating a satisfactory

explanation for its action." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  The BLM is required

to demonstrate proper application of the minimization criteria.  Accordingly, the court reverses

the BLM's route designations and finds them contrary to the applicable law.

## 2.  NEPA

Next, Plaintiffs argue that the BLM violated NEPA by failing to take a "hard look" at the

full impacts of designating 4,277 miles of motorized routes.  NEPA requires the BLM to take a

"hard look" at the environmental consequences of its proposed actions.  *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA, however, does not mandate particular

results, nor does it impose substantive environmental obligations.  *Id.* at 350-51.  "Although

labeled an 'environmental' statute, NEPA is in essence a procedural statute; it does 'not require

agencies to elevate environmental concerns over other appropriate considerations.'" *Park Cnty.*

*Res. Council, Inc. v. U.S. Dep't of Agri.*, 817 F.2d 609, 620 (10th Cir. 1987), *overruled on other*

*grounds*, 956 F.2d 970 (10th Cir. 1992).

Plaintiffs assert that although the BLM generally discusses the sort of theoretical impacts

that can result from OHV use at any place and at any time, the BLM has not specifically applied

this information to the resources of the Richfield planning area.  In *Center for Biological*

*Diversity*, the court held that "what is lacking from the [environmental analysis] is a discussion

of how soils would be impacted by the proposed . . .  route network.  A general discussion of

how soils are affected by OHV use . . . does not provide the public with information about how

to assess the particular impact of the proposed project."  746 F. Supp. 2d at 1094.  In this case,

the PRMP states rather generally that "the more area open to OHV use, the greater the potential

for adverse impacts to soil resources from trampling of vegetation and biological soil crusts,

which leads to compaction and accelerated erosion."  The EIS also states that limiting OHVs to

existing routes "confines the impacts to areas already disturbed or hardened for vehicle use."

Therefore, the EIS concludes that due to the reduction of some routes, soil impacts under the

selected alternative will be reduced from the no action alternative.

The BLM responds, however, that, unlike the minimization criteria, NEPA does not

require an individualized route-by-route analysis.  *Biodiversity Conservation Alliance v. BLM*,

404 F. Supp. 2d 212, 218 (D.D.C. 2005).  Plaintiffs do not contend that NEPA requires a route-

by-route analysis.  But they do contend that the environmental analysis "should contain some

discussion of the particular impacts on soils of the proposed Plan, both with regard to the

designated OHV route network, and livestock grazing."  *Ctr. for Biological Diversity*, 746 F.

Supp. 2d at 1094.

"'NEPA requires federal agencies to examine the environmental effects of a proposed

project and, for those actions that will significantly affect the environment, to inform the public

in an EIS of the relevant factors that were considered in the decision-making process.'" *Id.*

(quoting *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 811 (9th Cir. 2005)).  In

this case, the EIS generally discusses the potential impacts of OHV use on the environmental

resources in the Richfield area.  While the BLM's discussion of impacts to soils, streams, and

cultural resources as a result of OHV use is fairly cursory and fails to explain why such impacts

are acceptable, NEPA only requires the BLM to consider the impacts.  The discussion

sufficiently discusses impacts.  NEPA does not mandate a specific outcome and the court finds

no apparent procedural errors.  In many respects, the BLM's alleged shortcomings under NEPA echo those Plaintiffs raised under the minimization criteria.  The court agrees that the while the BLM identifies significant impacts to resources, its only response is that fewer routes are allowed under the new system than the old.  The BLM fails to address how those significant impacts to resources will be mitigated in any way other than the fact that some routes are being limited.  This shortcoming, however, is better remedied through a proper application of the minimization criteria than it is under the procedural dictates of NEPA.  Under NEPA, the BLM addressed the alternatives, discussed the impacts of each alternative, and chose the alternative it deemed most appropriate.

Plaintiffs take specific issue with whether the proper procedure was followed with respect to the 50/150 foot allowances for parking and campsite access.  Plaintiffs question whether any analysis was done in connection with these allowances.  However, the BLM's evaluation process states that it analyzed the "environmental sensitivity of the areas surrounding the route." Therefore, the court concludes that the BLM's process was sufficient under NEPA.

**3.  NHPA**

Under Section 106 of the National Historic Preservation Act ("NHPA"), federal agencies are prohibited from approving any federal "undertaking" unless the agency takes into account the effects of the undertaking on historic properties that are included in or eligible for inclusion in the National Register of Historic Places.  16 U.S.C. §§ 470f, 470w(7).  There is no dispute that the BLM's approval of the Richfield Travel Plan is an undertaking.  As such, the NHPA's implementing regulations require the BLM to "[r]eview existing information on historic properties within [that] area," and "take the steps necessary to identify historic properties within

12

the area of potential effects." 36 C.F.R. § 800.4(a)(1)-(2), § 800.4(b).  The regulations further require the BLM, in coordination with the State Historic Preservation Office ("SHPO") and Native American tribes, to determine whether the travel plan would have an "adverse effect" on cultural resources.  36 C.F.R. § 800.5(a).

Plaintiffs argue that the BLM violated the NHPA regulations by failing to make a "reasonable and good faith effort" to identify cultural resources and, consequently, making an unsupported "no adverse impacts" determination under Section 106.  Plaintiffs assert that despite the wealth of archeological resources within the Richfield planning area, less than five percent of this area has been inventoried.

Like NEPA, Section 106 is a "stop, look, and listen provision" that requires federal agencies to consider the effects of their actions and programs on historic properties and sacred sites before implementation.  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).  Also like NEPA, the NHPA imposes procedural not substantive requirements.

NHPA regulations require the BLM to make a "reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey" regarding cultural resources.  36 C.F.R. § 800.4(b)(1).  The BLM Manual sets out three types of surveys that may be used to identify historic and cultural resources.  BLM Manual § 8110.  A Class I survey relies on existing information and is "a professionally prepared study that includes a compilation and analysis of all reasonably available cultural resource data and literature, and a management-focused, interpretative, narrative overview, and synthesis of the data."  *Id.* § 8110.2.21.A.1.  A Class II survey involves on-the-ground surveying and is a "probabilistic field survey" or "statistically

13

based sample survey" that "aids in characterizing the probable density, diversity, and distribution of cultural properties in an area." *Id.* § 8110.2.21.B.1. A Class III survey is an on-the-ground intensive survey of the entire subject area "intended to locate and record all historic properties" and "provides managers and cultural resource specialists with a complete record of cultural properties." The Class III survey is the most frequently employed method of inventory. *Id.* § 8110.2.21.

In this case, the BLM inventoried four areas that the Richfield RMP designated open to cross-country OHV travel. The BLM relied on existing inventories for the remaining areas. The BLM relied on an agency instruction memorandum to conclude that a Class 1 "existing information inventory" was sufficient. However, Plaintiffs argue that the BLM's decision not to conduct additional inventories in the remaining areas was inconsistent with the BLM's obligation under Section 106 to conduct a good faith inventory of the cultural resources at risk from OHV trail designations. And, without that good faith inventory, there is no valid basis for concluding that the plan had no adverse impacts to cultural resources.

The BLM instruction memorandum "suggests that a Class I survey will suffice when a transportation plan proposes to maintain the status quo, but that a Class III inventory should be used when a plan authorizes new roads or increased traffic on existing roads." *Montana Wilderness Ass'n v. Connell*, Appeal No. 11-35818, 2013 WL 3927754, Slip Op. 37 (9th Cir. July 31, 2013). The memorandum states that "'[p]roposed designations that will not change or will reduce OHV use are unlikely to adversely affect historic properties and will require less intensive identification efforts.'" *Id.* However, "'[w]here there is a reasonable expectation that a proposed designation will shift, concentrate, or expand travel into areas where historic properties are likely

to be adversely affected, Class III inventory and compliance with section 106 [of the NHPA], focused on areas where adverse effects are likely to occur, is required prior to designation.'" *Id.*

Here, the BLM conducted an on-the-ground inventory of the area designated as open. The open area allowed travel to remain essentially unchanged. But, the BLM relied on only a Class I inventory for the area in which OHV use was limited to designated routes. Given that certain areas were closed and certain routes were limited, the BLM contends that the adverse effects on these fewer remaining routes were unlikely.

The closure of several other routes, however, would concentrate travel on the remaining routes and could likely impact cultural resources on the remaining routes. In response to the Colorado Plateau Archeological Alliance's protest over the PRMP, the BLM acknowledged that "there is some potential to affect sites that may be located on designated routes. There are undoubtedly roads that go through archaeological sites and sometimes there are site features within the roads that are being damaged. Continuing use on those roads may be an adverse effect on any sites located therein."

The instruction manual suggests that an on-the-ground Class III survey should have been conducted for the designated routes in the limited OHV use area because the designation of fewer routes will shift, concentrate, or expand travel into areas where historic properties exist. The *Montana Wilderness* court similarly held that the RMP in that case, which limited the areas open to travel in comparison to the prior system, would necessarily "concentrate pre-RMP traffic on the remaining designated roads" and, therefore, Class III inventories were required. *Id.* Slip Op. at 42-43.

In *Montana Wilderness*, the court rejected the BLM's claim that a Class I inventory was

sufficient for an RMP.  In that case the court recognized that the Missouri Breaks RMP was not

simply a "general land use plan; it also authorizes specific uses including over 400 miles of roads

and ways."  *Id.* Slip Op. at 40-41.  The same is true here.  The Richfield RMP and Travel Plan is

not just a general land use plan, it specifically designates 4,277 miles of roads and trails for OHV

use.  However, less than 5% of the planning area has been inventories by the BLM.  On-the-

ground surveys of the designated routes in the limited use area are necessary under the BLM's

instruction memorandum because of the shift and concentration of travel in the area.  *See id.* Slip

Op. at 41-43.  In addition, the BLM's promise to conduct more intensive surveys of the

designated routes in the future was an argument similarly raised and rejected by the *Montana*

*Wilderness* court because future inventories would not alleviate the "threat to historic sites . . .

posed by existing authorized uses."  *Id.* Slip Op. at 43.

The BLM contends that it has followed all proper procedures under Section 106 by

entering into a programmatic agreement with the Utah SHPO.  In 1997, the BLM entered into a

national programmatic agreement with the Advisory Council and, according to that agreement,

then entered into a State Protocol Agreement with the Utah SHPO for considering cultural

resources on BLM-administered lands in Utah.  The BLM has also developed a manual and

internal guidance memorandum on the NHPA Section 106 process.  The BLM contends that it

fulfilled its obligations under the NHPA by complying with these regulations, the National

Programmatic Agreement, and guidance memorandum.  The BLM cites to the implementing

regulations, to assert that when an agency has entered a programmatic agreement with the

relevant SHPO, that programmatic agreement governs the NHPA Section 106 process and

compliance with the programmatic agreement "satisfies the agency's section 106

responsibilities." 36 C.F.R. §§ 800.14(b)(2)(iii), 800.3(a)(2).

While the NHPA requires the BLM to consult with the Utah SHPO, its consultation with SHPO merely satisfies the procedural requirement of doing such a consultation. A concurrence from the SHPO does not satisfy the other procedural requirements of NHPA. There is nothing in the NHPA or Section 106 that excuses the BLM's failure to comply with the other procedures based on a concurrence from the SHPO.

As in *Montana Wilderness*, the court concludes that the BLM's failure to conduct a Class III survey of the designated routes within the limited OHV use area fails to meet the requirements of NHPA. Because it only conducted a Class I survey, the BLM has not demonstrated that it conducted a reasonable and good faith inventory of the cultural resources present on the designated routes in the limited OHV use area. Therefore, the BLM's finding that there were likely no adverse affects as a result of the road and trail designations in the limited OHV use area was arbitrary and capricious. Accordingly, the court remands the matter to the BLM to conduct a Class III survey of the designated routes in the limited OHV use area.

**4. OHV Impacts and Climate Change**

Plaintiffs further argue that the BLM violated NEPA and Secretarial Order 3226 by failing to consider OHV impacts in the context of climate change. In 2001, the Secretary of the Interior issued Secretarial Order 3226, stating that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Secretarial Order 3226 § 1 (Jan. 19, 2001). Accordingly, agencies withing the Department of the Interior were required to "consider and analyze potential climate change impacts when undertaking long-range planning exercises . . . [and] when

developing multi-year management plans." *Id.* § 3.  In addition, under NEPA, the BLM must take a "hard look" at the cumulative impacts of OHV use and climate change.  42 U.S.C. § 4332(2)(c); 40 C.F.R. §§ 1508.7, 1508.25(c).

The parties dispute whether  Secretarial Order 3226 is enforceable against an agency in this context.  The BLM claims that the order is not a substantive rule, whereas Plaintiffs argue that the order has the same force and effect as other rules and regulations issued by the Secretary of the Interior.

However, assuming that the order is enforceable, there is sufficient evidence in the record demonstrating that the BLM complied with the directive to "consider and apply" climate change impacts as a result of OHV use.  The EIS in this case identifies the climate changing pollutants at issue, the studies regarding the environmental impacts of those pollutants, and the activities in the Richfield Planning Area that may generate emissions of such climate changing pollutants. The draft EIS and EIS established the existing baseline climate of the Richfield Planning Area. The EIS also examined the potential long-term emissions impacts associated with OHV use and determined them to be minimal.  The EIS further found OHV impacts to soil, vegetation, and water resources would be reduced compared to the no-action alternative.

The EIS' cumulative impacts analysis explains that resource decisions in the RMP combined with past, present, and reasonably foreseeable future actions could produce cumulative impacts in the planning area.  With respect to climate change specifically, the EIS recognized potential impacts to air quality are likely to be varied, that activities in the planning area may generate emissions of climate changing pollutants, and that impacts could occur from wind erosion and fugitive dust.  The EIS recognized that management activities in the planning area

18

may help sequester carbon, such as managing vegetation to favor perennial grasses and increase vegetative cover, which may help build organic carbon in soils and function as "carbon sinks." The court concludes that this discussion of OHV impacts and climate change pollutants is sufficient for purposes of complying with the directive to consider and analyze the issue of OHV impacts on climate change.

Plaintiffs further argue that the BLM violated NEPA's mandate that agencies take a "hard look" at OHV impacts in the context of climate change.  42 U.S.C. § 4332(2)(c).  To satisfy the "hard look" requirement, an EIS must describe the existing environment that will be affected by the proposal to provide a baseline for comparison.  40 C.F.R. § 1502.15.  The EIS must then analyze and disclose any significant impacts of the proposed action and reasonable alternatives. The agency must evaluate those impacts through a "cumulative effects" analysis that addresses "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. §§ 1508.7, 1508.25(c).

The analysis conducted to comply with Secretarial Order 3226 is also sufficient to comply with NEPA's "hard look" requirement.  The BLM identified the existing environment, the affects of the proposal, the alternatives of no change, and conducted a cumulative impacts analysis. Although Plaintiffs do not like the fact that the State BLM provided information to local BLM offices, the information was nonetheless analyzed and considered.  In addition, the BLM is limited in its ability to predict specific climate change on a regional and local scale because of a lack of scientific tools designed for such purposes.  Accordingly, the court finds that there was no NEPA violation with respect to the BLM's analysis of OHV use and climate change.

**5. Air Quality Standards under FLPMA**

Plaintiffs next argue that the Richfield RMP violates FLPMA because it does not ensure compliance with federal air quality standards.  FLPMA requires the BLM to ensure that its land use plans "provide for compliance with applicable pollution control laws, including State and Federal air . . . pollution standards or implementation plans."  43 U.S.C. § 1712(c)(8).  Under the Clean Air Act ("CAA"), the United States Environmental Protection Agency ("EPA") establishes National Ambient Air Quality Standards ("NAAQS") for certain pollutants in order to protect the public health and welfare.  *See* 42 U.S.C. §§ 7408, 7409.[1]  The two pollutants Plaintiffs address as relevant to this case are fine particulate matter, referred to as "PM2.5" and ground-level ozone under 40 C.F.R. § 50.13 (PM2.5) and § 50.15 (ozone).   Plaintiffs argue that the BLM violated FLPMA's requirements by failing to demonstrate that the OHV use authorized by the RMP and Travel Plan will not result in violations of the NAAQS.

The BLM asserts that it satisfies FLPMA § 1712(c)(8) through its partnership with the State of Utah Division of Air Quality ("UDAQ"), which has delegated authority from the EPA to enforce the CAA.  When a geographical zone meets the EPA's NAAQS, it is considered to be an attainment area.  42 U.S.C. § 7407(d)(1)(A)(ii).  Conversely, when a zone fails to meet the NAAQS, it is considered to be a nonattainment area.  *Id.* § 7404(d)(1)(A)(i).  UDAQ applies and enforces these standards.  However, the BLM ensures that all permitted activities in the Richfield planning area reference and comply with the applicable NAAQS.

Plaintiffs contend that the record demonstrates an instance where air quality exceeded the

---

[1]  Utah has incorporated the NAAQS into state law and implements the standards within the state.  Utah Code Admin. R. 307-101-1.

NAAQS for PM2.5.  However, in this instance, the exceedance did not occur within the

Richfield planning area.  It occurred in Lindon, Utah, an urban area approximately 40 miles from

the closest county line in the Richfield planning area.  Therefore, there is no PM2.5 exceedance

registered in the Richfield planning area.  The BLM also relied on UDAQ's 2007 annual air

quality report–the last report the BLM could rely on before concluding the RMP planning

process–which indicated that there were no nonattainment areas in Utah for PM2.5.  Therefore,

the Richfield planning area is in an attainment zone.  From this base point, the BLM examined

whether the impacts of the OHV use allowed under the RMP and Travel Plan would cause an

exceedance in the PM2.5 NAAQS.  The EIS found that "[g]iven the low ambient concentrations

that exist in the [Richfield planning area] for some pollutants, it is expected that the increase in

emissions of CO, Nox, SO2, PM10, and PM2.5 for the Proposed RMP would not cause

concentrations to exceed NAAQS or state ambient air quality standards."  Therefore, Plaintiffs

have failed to establish that the BLM violated FLPMA's mandate to provide for compliance with

air quality laws.

Plaintiffs also contend that there was a NAAQS exceedance with respect to ozone.

Plaintiffs contend that the three-year average of ozone levels in Canyonlands and Zion National

Park show elevated ozone levels, but the BLM asserts that Plaintiffs' calculations are incorrect.

The ozone level is not exceeded when applying the applicable NAAQS standard, which looks at

whether the three-year average of the annual fourth-highest daily maximum eight-hour average is

less than or equal to .075 ppm.  In addition, while the Zion monitoring station registered an

ozone exceedance, it is 150 miles from the Richfield planning area.  Whereas the Canyonlands

monitoring station, which is in the Richfield planning area, never registered an ozone

exceedance.  There is no basis for combining the Zion and Canyonlands data.

Plaintiffs claim that the BLM violated FLPMA § 1712(c)(8) because it acknowledged that certain emissions in the Richfield planning area will increase over time.  However, as found above, there is no exceedance of air quality standards to date in the Richfield planning area.  Therefore, the question is whether the BLM properly analyzed whether upward trends in pollutants were adequately analyzed.

In analyzing potential air quality impacts in the EIS, the BLM implemented a qualitative emission comparison approach to study each proposed alternative.  "[E]missions calculations were based upon the best available engineering data and assumptions; on air, visibility, and atmospheric deposition data; on emission inventory procedures; and on professional and scientific judgment."  Emissions were calculated for activities such as resource extraction, grazing, and OHV use using a 15-year time period.  The BLM determined that the "range of total emissions is minor and the difference between the alternatives is not significant."  Again, the BLM also concluded, based on its calculations, that "the increase in CO, Nox, SO2, PM10, and PM2.5 emissions from any alternative would not cause the concentrations to exceed NAAQS or state ambient air quality standards."

The court concludes that Plaintiffs have not provided any evidence or arguments to refute the BLM's conclusion that the Richfield planning area would comply with all air quality standards.  Therefore, the court finds no violation of FLPMA § 1712(c)(8) with respect to air quality.

**6.  FLPMA and Areas of Critical Environmental Concern**

Plaintiffs further argue that the BLM violated FLPMA by failing to prioritize the

designation of Areas of Critical Environmental Concern ("ACECs").  When developing land use

plans, FLPMA requires the BLM to "give priority to the designation and protection of areas of

critical environmental concern."  43 U.S.C. § 1712(c)(3).  FLPMA defines ACECs as "areas

within public lands where special management attention is required . . . to protect and prevent

irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or

other natural systems or processes, or to protect life and safety from natural hazards."  *Id.* §

1702(a).  A potential ACEC must have: (1) "relevance," meaning it possesses "a significant

historic, cultural, or scenic value [or] a fish or wildlife resource or other natural system or

process," and (2) "importance," meaning the relevant values, resources or processes have

"substantial significance."  43 C.F.R. § 1610.7-2(a); BLM Manual § 1613.11.

The priority afforded ACECs reflects Congress' intent to elevate the designation and

protection of ACECs over BLM's default management for "multiple use."  *Id.* § 1732(a).

However, FLPMA states that the "identification of [ACECs] shall not, of itself, change or

prevent change of the management or use of public lands."  *Id.* § 1711(a).

In this case, prior to adopting the Richfield RMP, the BLM had previously designated

four ACECs totaling 14,780 acres.  During the Richfield RMP planning process, 26 potential

ACECs were nominated for designation and the BLM assembled a team to evaluate those areas

in accordance with the guidance in 43 C.F.R. § 1610.7-2 and the BLM Manual § 1613.  The team

prepared a 150-page report analyzing each area.  Based on these evaluations, 16 of the potential

26 ACECs were carried forward for further designation consideration in the EIS.  The sixteen

areas, totaling 886,810 acres, were identified as meeting the relevance and importance criteria for

ACEC designation.  The BLM, in the EIS, then considered these areas under each proposed

management alternative in the DRMP.  In addition to the EIS, the ROD identified each ACEC

under consideration and provided an explanation as to how the "relevant and important" values

would be protected under management prescriptions other than ACECs.  The BLM ultimately

designated only 2 ACECs covering just 2,530 acres.

     The BLM's decision, therefore, dramatically cut the acreage of even existing ACECs.

The BLM stated that it did not designate more ACECs because "standard management" under the

RMP would provide adequate protection.  Plaintiffs argue that the BLM's actions demonstrate

that priority was not given to the designation of ACECs.  In contrast, the BLM argues that it

prioritized those areas for consideration under the standards and ensured that they were

adequately protected through ACEC designations or other management prescriptions and that is

all that is required under FLPMA.  The court concludes that the general process the BLM

employed to determine ACECs did not violate FLPMA.

     Plaintiffs, however, also specifically challenge whether the BLM complied with

FLPMA's mandate to provide special management attention under an ACEC for the Henry

Mountains, Badlands, and Dirty Devil potential ACECs.  The BLM argues, that these potential

ACECs were analyzed and considered in accordance with FLPMA just like the many other

potential ACECs.

     First, the 45% of the potential Henry Mountains ACEC contains land already designated

as a Wilderness Study Area ("WSA") and 55% of the land is protected by OHV restrictions,

Visual Resource Management Class II designation, and other seasonal/spatial restrictions.  While

the BLM describes how the WSA management designation will protect all relevant and

important values in that part of the ACEC, it makes no assertion for how the remaining area in

the potential ACEC is protected by its resource management classifications.  The BLM's analysis of the area actually supports the designation of the area as an ACEC and runs contrary to the BLM's ultimate designations.

The BLM also argues that it can mitigate harm caused by potential future coal mining through the NEPA process.  However, the availability of a future NEPA review for specific projects does not relieve the BLM of its current obligation to comply with FLPMA in its planning process.

The decision not to designate the Henry Mountains as an ACEC appears to be arbitrary and capricious because it did not result from an application of the standards in FLPMA to the area in question.  The BLM's original preferred alternative in the DRMP included designation of the Henry Mountains ACEC.   However, as a result of the national BLM office's concern that the counties were not "on board" with that designation, the field office received "management direction" to remove the Henry Mountains ACEC designation.  This management decision gave no analysis in connection with the required FLPMA standards; rather, it appears to be based on political concerns.  Such a basis for the decision does not comply with FLPMA.  Accordingly, the court finds that the BLM's decision with respect to the Henry Mountains ACEC was arbitrary and capricious and contrary to law.

Next, the potential Badlands ACEC comprises 90,000 acres, including 7,700 acres that were previously designated as an ACEC.  Plaintiffs argue that the BLM decided not to designate the area as an ACEC out of a desire to keep the area open for OHV use rather than the required directive to determine whether special management was required.  BLM's chosen alternative, however, reduced open OHV acres from 40,000 to 8,000.  The BLM explained its decisions with

respect to OHV use in connection with the resource values at issue.  While Plaintiffs disagree

with whether the BLM's ultimate determination is proper, the BLM complied with FLPMA by

limiting OHV use, and tying its decision to the required considerations of the relevant and

important resource values in the area.  Therefore, the court finds no FLPMA violation with

respect to the potential Badlands ACEC.

Plaintiffs also object to the BLM's failure to designate the potential Dirty Devil ACEC

because of the OHV use allowed in the area.  Again, however, the BLM considered the resource

values of the area and limited OHV use in the area.  The BLM closed 51% of the area to OHV

use and allowed limited designated routes within 49% of the area.  Because the BLM considered

the impact of OHV use on the resource values of the area and applied the required FLPMA

criteria, the court finds no FLPMA violation in the BLM's decision not to designate the Dirty

Devil ACEC.

**7.  Wild and Scenic Rivers Act Designation**

Finally, Plaintiffs contend that the BLM violated the Wild and Scenic Rivers Act

("WSRA") by eliminating eligible river segments based on their alleged ephemeral flows.  The

WSRA protects "free-flowing" rivers and streams with "outstandingly remarkable . . . values . . .

for the benefit and enjoyment of present and future generations."  16 U.S.C. § 1271.  In

connection with the RMP planning process, the WSRA required the BLM to take a two-step

process to evaluate whether rivers within the planing area qualify as potential wild and scenic

rivers.  *Id.* at § 1276(d)(1).  First, the BLM must determine which river segments are "eligible"

for consideration and, then, must determine which "eligible" segments are "suitable" for wild and

scenic designation.  *Id.* §§ 1273(a), (b), 1275(a).  The BLM is charged with managing eligible

and suitable rivers to protect their free-flowing nature and outstandingly remarkable values. *Id.* §
1283(a).

A river segment is "eligible" if it is: (1) "free-flowing," and (2) possesses one or more
"outstandingly remarkable scenic, recreational, geologic, fish, and wildlife, historic, cultural, or
other similar values." *Id.* §§ 1271, 1273(b). The WSRA defines "free-flowing" as "existing or
flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other
modification of the waterway." *Id.* § 1286(b).

In this case, the BLM evaluated 304 drainages and determined that twelve river segments
were "eligible" for inclusion and only one segment was "suitable" for wild and scenic
designation. Plaintiffs argue that the BLM erroneously disqualified several river segments from
being eligible for consideration based solely on the alleged ephemeral nature of their flows.
Specifically, Plaintiffs assert that the BLM recognized that the streams in Happy Canyon, Big
Hollow, Fiddler Cove Canyon, Horseshoe Canyon, and Buck and Pasture Canyon are free of
man-made barricades, exist in their natural condition, and possess outstandingly remarkable
values. The only issue is whether these rivers were ineligible for consideration based solely on
the claim that their flows are ephemeral.

The BLM asserts that its preliminary determinations of eligibility were informed by the
BLM Manual § 8351, which it claims does not state whether ephemeral river segments are
eligible for determination. Plaintiffs, however, contend that the BLM Manual demonstrates that
the WSRA imposes no minimum flow requirement for a river to be free-flowing. Plaintiffs rely
on the following guidance in the manual: "A river need not be 'boatable or floatable' in order to
be eligible. . . . [T]he volume of flow is sufficient if it is enough to maintain the outstandingly

remarkable values identified within the segment.  Rivers with intermittent flows exist within the [National Wild and Scenic River System], and rivers representative of desert ecosystems having outstanding ecological or other values, should be considered."  BLM Manual § 8351.31(B)(1).

Because this guidance refers only to intermittent rivers, the BLM's Utah State Director sought clarification from the BLM's National Landscape Conservation System Director on when a river is "free-flowing" and whether intermittent or ephemeral water courses are eligible for WSRA designation.  That request resulted in the BLM's June 2004 issuance of Instruction Memorandum ("IM") 2004-196.  IM 2004-196 explains that an eligible river segment "should contain regular and predictable flows (even though intermittent, seasonal, or interrupted).  This flow should derive from naturally occurring circumstances, e.g. aquifer, recharge, seasonal melting from snow or ice, normal precipitation, instream flow from spillways or upstream facilities."  Furthermore, the IM states "[c]aution is advised in applying the free-flow criterion to water courses that only flow during flash floods or unpredictable events.  The segment should not be ephemeral (flow lasting a few days out of a year)."

Based on the eligibility criteria and IM 2004-196, the BLM deemed 6 river segments ineligible based on its determination that they were ephemeral.  The BLM defined ephemeral as a "[d]ry wash flowing water only during or immediately after a storm with little or no evidence of riparian vegetation."  By contrast, it defined intermittent streams as having "[f]lowing water in at least part of the segment most of the year and evidence of riparian vegetation."

The parties dispute whether the BLM's criteria is consistent with the WSRA's statutory language defining free-flowing.  Plaintiffs argue that the BLM's criteria is contrary to the WSRA's broad definition of free-flowing, which does not speak to how or when the stream

exists.   Plaintiffs assert that there is no need to add a minimum flow requirement when the

statute does not contain one.  *See U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1164 (10th Cir.

2012) ("If the statute is clear, we apply its plain meaning and the inquiry ends.").

However, the BLM contends that the WSRA is undeniably silent on whether "free

flowing" includes water courses that only flow for a short duration following unpredictable

weather events and there is nothing in the plain language of the WSRA's definition of free-

flowing that requires it to include ephemeral river segments.  The Supreme Court has made clear

that when a "statute is silent or ambiguous with respect to the specific issue, the reviewing court

must defer to the agency's construction of the statute so long as it is reasonable.  *Mineral Policy*

*Ctr. v. Norton*, 292 F. Supp. 2d 30, 37 (D.D.C. 2003) (citing *Chevron, U.S.A., Inc. v. NRDC*, 467

U.S. 837, 843 (1984)).

In this case, because of the silence with respect to ephemeral river segments in both the

WSRA and the BLM Manual, the BLM asked its national headquarters for clarification as to the

inclusion of intermittent and ephemeral river segments.  The national headquarters determined

that rivers with intermittent or seasonal flows should be eligible but ephemeral segments, where

the flow lasts for only a few days out of the year, are not eligible.  The court cannot conclude that

this interpretation was unreasonable.  "*Chevron* and its progeny make clear that '[w]hen a

challenge to an agency construction of a statutory provision, fairly conceptualized, really centers

on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap

left open by Congress, the challenge must fail.'"  *Id.* at 37 (quoting *Chevron*, 467 U.S. at 866).  If

the construction is reasonable, *Chevron* requires the court to accept the construction, "'even if the

agency's reading differs from what the court believes is the best statutory interpretation.'"

*Rivera-Barrientos v. Holder*, 666 F.3d 641, 645 (10th Cir. 2012).  Although the court may not have interpreted free-flowing in the same manner, it cannot conclude that the BLM's interpretation was unreasonable.

Plaintiffs also argue that the BLM's position on ephemeral river segments is not entitled to deference because it constitutes a dramatic and unexplained change in policy.  However, the BLM did not change policy with respect to intermittent rivers.  It only clarified its policy on ephemeral rivers.  The BLM studied these ephemeral rivers in its process of determining which segments were eligible for inclusion.  This initial effort does not demonstrate a shift in policy.  Rather, the effort caused the local BLM to inquire as to appropriate policy from its national office.  The national BLM issued IM 2004-196 as a "Clarification of Policy" that could be used as guidance by local BLM offices nationwide.  IM 2004-196 specifically states that it is not a change in policy.  The BLM did not have a prior position on the inclusion of ephemeral river segments.  The statement of Doug Thurman–"I think things have changed"–is only his opinion.  The statement does not demonstrate that the whole agency made an actual policy change.  It is also consistent with the fact that the local BLM was now faced with implementing the clarifications on ephemeral rivers.  Therefore, the court finds no basis for concluding that the BLM inappropriately changed its policy with respect to ephemeral rivers.

Specifically, Plaintiffs also ask this court to review whether the BLM appropriately applied its definitions of ephemeral and intermittent to the specifically challenged rivers in this case.  Based on the guidance it received in IM 2004-196, the local BLM defined an ephemeral river as a "[d]ry wash flowing water only during or immediately after a storm with little or no evidence of riparian vegetation" and an intermittent stream as having "[f]lowing water in at least

part of the segment most of the year and evidence of riparian vegetation."[2]

Plaintiffs point out that while the BLM characterized these specific streams as dry washes that flow only in response to storms and generally lack riparian vegetation, there is record evidence to the contrary.  Before the BLM made its final determinations, several detailed comments were presented to the BLM by Steve Allen, who had traveled the areas on foot.  The French Spring Fork of Happy Canyon is described as having perennial springs that are host to a diverse number of plants, trees, and flowers.  The spring areas in Buck and Pasture Canyons have substantial riparian habitats near their mouths leading to the Dirty Devil River, lined with reeds, willows, rushes and cottonwood trees, that are used by ducks in spring migration.  Another record citation describes the canyons as having "riparian areas that are choked with vegetation." Fiddler Cove Canyon has small seeps and ephemeral springs supporting cottonwood tress, and several large potholes that provide habitat for mammals.  Also, during the spring, the Red Benches area of Fiddler Cove Canyon is carpeted with sego lilies.

The BLM's notes of these areas state that Fiddler Cover Canyon has only ephemeral flows.  The evidence provided by Steve Allen, although quite detailed, does not conclusively show that the Fiddler Cove Canyon has enough flow to be considered intermittent.  Therefore, the court finds no basis for reversing the BLM's decision on Fiddler Cove Canyon.

The BLM's notes from Happy Canyon state that a member of the staff went up the

---

[2]  The court questions whether the BLM's definition of intermittent complies with the instruction given in IM 2004-196.  The requirement that an intermittent river have flowing water "most of the year" is a higher standard than the IM's acceptance of a seasonal river.  In addition, the definition appears to leave a "no man's land" between an ephemeral river that only last for a few days after a weather event and a river that runs most of the year.  The practical application of these divergent definitions with respect to desert streams in particular appears unworkable.

canyon several miles but did not see any riparian vegetation or intermittent flow.  The BLM also

looked at aerial photographs, which it claims shows that the canyon is dry.  However,

intermittent flows may only be seasonal, and the BLM does not state what time of year the

photographs were taken.  In addition, the evidence from the BLM and the evidence submitted to

the BLM by Steve Allen contrast significantly with respect to the criteria the BLM used.  In the

BLM's Wild and Scenic River Eligibility and Tentative Classification Report, the new evidence

from Steve Allen was referenced by the BLM with respect to Buck and Pasture Canyons but not

with respect to Happy Canyon.  *See* RICH044634-5.  The evidence from Steve Allen is based on

his on-the-ground analysis, which the court finds more helpful than aerial photographs.  And, the

evidence specifically states that there are perennial springs.  Such information would support a

finding that the springs are intermittent rather than the result of random storms.  In addition,

Allen specifically describes riparian vegetation.  Both these pieces of information would support

a finding that Happy Canyon is intermittent rather than ephemeral and eligible for consideration

as a wild and scenic river.  The information from Steve Allen, however, does not appear to have

been analyzed by the BLM in making its final decisions.

Given that the information relates specifically to the criteria developed by the BLM, the

BLM should at least consider and analyze it.  The court is not determining that Happy Canyon

qualifies as a wild and scenic river.  Rather, the court is requesting the BLM to re-evaluate the

information provided to it and make a fully informed and reasoned consideration of whether

Happy Canyon is eligible and suitable as a wild and scenic river.  Without such analysis and

consideration of information in its possession, the present determination appears to be arbitrary

and capricious.

In addition, with respect to Buck and Pasture Canyon, the BLM's consideration of Steve Allen's comments lacks any substantive analysis.  Unlike Happy Canyon, the BLM does recognize the fact that Steve Allen provided new information.  However, the new information it recognizes is only a section where Allen provides his opinion that the BLM "missed the boat with not recommending these canyons."  The inclusion of only that opinion misses the boat with respect to the substantively important comments Allen provided with respect to whether the canyons met the eligibility criteria.  Both canyons have areas at the mouths of the canyons with springs and riparian vegetation such as reeds, willows, and rushes.  Ducks also frequent the areas during spring migration, which supports a conclusion that water is present at least seasonally.  This evidence is not discussed by the BLM.  However, such evidence could support a finding that the spring areas of both canyons qualify as intermittent rather than ephemeral streams.  Again, the court is not determining that the areas, in fact, qualify as wild and scenic rivers.  Only that the record shows a lack of consideration or analysis of information directly relating to the criteria put in place by the BLM for determining ephemeral or intermittent streams.  As determined above with respect to Happy Canyon, the court concludes that the BLM should reevaluate the spring areas of Buck and Pasture Canyons for eligibility and suitability under the WSRA.

## CONCLUSION

The court reverses and affirms the Richfield RMP and Travel Plan as discussed above. The court concludes that: (1) the BLM's failed to apply the minimization criteria in its preparation of the Travel Plan; (2) the BLM complied with NEPA's "hard look" requirement with respect to the impacts of OHVs; (3) the BLM violated the NHPA by failing to take into account the impact of OHV routes on archeological sites; (4) the BLM sufficiently considered the

impacts of OHVs in the context of climate change; (5) the BLM complied with FLPMA with respect to air quality standards; (6) the BLM generally complied with prioritizing ACECs, with the specific exception of the proposed Henry Mountains ACEC; (7) the BLM generally complied with the WSRA in its implementation of eligibility criteria and its determinations of eligible and suitable rivers, with the specific exceptions of Happy Canyon and Buck and Pasture Canyons spring areas.

The court grants the Federal Defendants' request that the court permit an opportunity for further briefing on the proper scope of remedies.  The parties shall file simultaneous briefs on the proper remedies as a result of this decision by December 6, 2013.  The parties may then file simultaneous reply memoranda by January 10, 2014.  The court does not anticipate holding oral argument on the remedies issue.

DATED this 4th day of November, 2013.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

34