JOHN W. HUBER, United States Attorney
JARED C. BENNETT, Assistant United States Attorney (#9097)
185 South State Street #300
Salt Lake City, Utah 84111
tel: (801) 325-3259; fax: (801) 325-3261
jared.bennett@usdoj.gov

JOHN C. CRUDEN, Assistant Attorney General
LUTHER L. HAJEK, Trial Attorney (*pro hac vice*)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace - Suite 370
Denver, CO  80202
tel: (303) 844-1376; fax: (303) 844-1350
luke.hajek@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | ) ) ) | Consolidated Case No. 2:12cv257 DAK<br>Honorable Dale A. Kimball |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **DEFENDANTS' MOTION FOR A PARTIAL STAY OF THE REMEDY ORDER PENDING APPEAL** |
| JANICE SCHNEIDER, *et al.*, | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| EOG RESOURCES, *et al.*, | ) ) | |
| Defendant-Intervenors. | ) ) | |
| _____ | ) | |

## INTRODUCTION

Defendants Janice Schneider, Assistant Secretary for Lands and Minerals Management of the U.S. Department of the Interior, and the U.S. Bureau of Land Management ("BLM") hereby move, pursuant to Fed. R. Civ. P. 62(c), (e), and (h), for a partial stay of the Court's Memorandum Decision and Order of May 22, 2015 regarding remedy ("Remedy Order") (ECF No. 388) pending appeal.  In that order, the Court ordered BLM, among other things, to complete a route evaluation process applying the criteria in 43 C.F.R. 8342.1 and to conduct Class III cultural resource inventories on all 4,277 miles of designated routes in the Richfield Planning Area within a three year period.  *See id.* at 7-8.  Defendants respectfully ask the Court to stay those requirements pending an appeal, should the Court grant Defendants' separately filed motion for entry of final judgment pursuant to Fed. R. Civ. P. 54(b).  *See* ECF No. 408.  Defendants do not seek to stay the other requirements of the Court's Remedy Order.  Defendants' counsel has consulted with counsel for the other parties.  Plaintiffs oppose this motion, and the intervenors do not oppose it.

A partial stay of the Court's Remedy Order with respect to the required Class III surveys and the related route designation process is warranted because BLM is likely to prevail on the merits of an appeal regarding Plaintiffs' National Historic Preservation Act ("NHPA") claim.  BLM complied with its obligations under Section 106 of the NHPA through compliance with a National Programmatic Agreement, Protocol Agreement with the Utah State Historic Preservation Officer ("SHPO"), and its internal guidance.  Further, BLM was not required either by the NHPA regulations or its guidance to conduct intensive Class III surveys of all 4,277 miles of designated routes in the Richfield Planning Area before designating routes for motorized use,

1

including off-road vehicles (otherwise known as "off-highway vehicles" or "OHVs") in the

Richfield Resource Management Plan ("RMP") and Travel Management Plan ("Travel Plan").

The agency would be irreparably harmed by the requirement to conduct surveys on

4,277 miles of routes, and conducting those surveys would not serve the public interest.  This

requirement is incredibly burdensome to the agency and will prevent it from accomplishing other

tasks to protect cultural and natural resources.  To comply with the Court's Remedy Order, BLM

must use outside contractors, which would cost BLM roughly $2.9 million to complete the Class

III surveys.  In contrast, BLM Utah's entire cultural resources budget over a three-year period is

$3.9 million, which means that BLM Utah will have to seek funding from other sources or

deplete its three-year budget.  Further, even after the surveys are completed, BLM must use the

results of the surveys to complete the procedural requirements of the NHPA, and also use the

results of the surveys to complete its route evaluation process, including application of the

designation criteria in 43 C.F.R. § 8342.1.  These tasks will require months and years of work by

BLM personnel.  In order to allocate the necessary funds and personnel to the surveys, BLM

would have to divert funds and manpower from other important projects and tasks designed to

protect cultural resources both in Utah and nationally.

Moreover, Plaintiffs cannot identify any likelihood of irreparable harm that will result

from a stay of the district court's remedy order.  Existing inventories show site densities are low

across Richfield, BLM has avoided or mitigated sites that it identified, and the potential for new

impacts to cultural resources from vehicle use in the area is low because routes designated for

use have been in existence for decades.  In addition, following the remedy order, BLM

conducted an additional Class I survey to identify areas with a high potential for having cultural

2

and natural resources that might be harmed by OHV use.  BLM has been conducting, and will to

continue to conduct,  targeted Class III inventories in such high potential areas, will mitigate

potential for harm to cultural resources where they are identified, and will continue the route

evaluation process in accordance with 43 C.F.R. § 8342.1.  The route evaluation process,

however, cannot be completed until the results of the Class III surveys and the NHPA process

are incorporated into the analysis because BLM is required by the regulation to locate routes to

minimize damage to "other resources of the public lands," which includes any cultural resources

identified in a Class III survey.  43 C.F.R. § 8342.1(a).  Accordingly, Defendants respectfully

submit that a partial stay pending appeal of the Remedy Order with respect to the completion of

the Class III survey and application of 43 C.F.R. § 8342.1 is warranted.

      Defendants request that the Court issue a ruling on this motion as soon as possible

because every day that BLM spends complying with the Remedy Order diverts resources away

from other programs.  At the latest, Defendants request that the Court issue a ruling by

November 16, 2015 in order to allow BLM time to finalize additional phases of a contract for the

survey work.  Due to the cost and complexity of the required Class III survey, the contracting

process has been more difficult than usual.  *See* Declaration of Nathan Thomas ("Thomas Decl.")

¶¶ 44-50, attached hereto.  Currently, BLM expects to enter into one contract with multiple

phases and expects to enter into a contract for the first phase of the work (a commitment of

approximately $1,700,000) by the end of this fiscal year, September 30, 2015.  *Id.* ¶¶ 47-48.

BLM will need to secure the funding for the second and third phases of the contract by early

2016.  *Id.* ¶ 48.  Therefore, to allow sufficient time for the completion of that contracting process

and, if necessary, to allow time for the court of appeals to decide a motion for stay, Defendants

request that the Court issue an order on this motion no later than November 16, 2015.

## BACKGROUND

### I.     Legal Background

#### A.     BLM's Off-Road Vehicle Management

Pursuant to its authority under Federal Land Policy and Management Act ("FLPMA"), 43

U.S.C. 1701 *et seq.*, and its general authority to manage public lands, BLM has issued

regulations governing the use of off-highway vehicles ("OHV") on public lands administered by

BLM.  *See* 43 C.F.R. Pt. 8340.  Specifically, the regulations contain criteria for the designation

of particular areas as open, limited, or closed to off-road vehicle use.  *See* 43 C.F.R. § 8342.1.

The regulations require BLM, in designating areas for off-road vehicle use, to minimize harm to

soil, vegetation and other resources, to minimize the harassment of wildlife, to minimize

conflicts between off-road vehicle use and other recreational uses of the public lands, and to

avoid wilderness areas.  *Id.*

#### B.     National Historic Preservation Act

Section 106 of the NHPA requires federal agencies to "take into account" the potential

impacts on historic properties prior to the approval of a "Federal . . . undertaking."  54 U.S.C. §

306108.[1]  Like NEPA, the NHPA creates procedural obligations but confers no substantive rights

and does not dictate any substantive outcome regarding historic properties.  *Valley Cmty. Pres.*

*Comm'n v. Mineta*, 373 F.3d 1078, 1085 (10th Cir. 2004).  Regulations promulgated by the

---

[1] The NHPA has recently been re-codified, and the prior citation for Section 106 was 16 U.S.C. § 470f.  The substance has not been changed.

Advisory Council on Historic Preservation ("ACHP") set forth procedures for the action

agency's implementation of the act.  *See* 36 C.F.R. Pt. 800.

Under the ACHP's regulations, an agency must make a "reasonable and good faith

effort" to identify historic properties in the area affected by the agency's action.  36 C.F.R. §

800.4.  If the agency identifies historic properties eligible for listing on the National Register of

Historic Places, then the agency must determine whether its action would have "adverse effects"

on those properties.  36 C.F.R. § 800.5.  "An adverse effect is found when an undertaking may

alter, directly or indirectly, any of the characteristics of a historic property that qualify the

property for inclusion in the National Register . . . ."  *Id.* § 800.5(a)(1).  If the agency determines

that its action would have no such effects, it may propose a finding of "no adverse effect" to the

SHPO.  *Id.* § 800.5(b).  If the SHPO agrees with the finding, the agency may proceed with the

undertaking.  *Id.* § 800.5(c)(1).

The regulations also provide for an alternative method of meeting the agency's Section

106 obligations, particularly where the agency's action may affect very large areas of land.

Specifically, the regulations provide that rather than go through the identification process

outlined above, an agency may meet its procedural obligations under Section 106 NHPA by

complying with a programmatic agreement approved by the ACHP.  36 C.F.R. §§ 800.3(a)(2),

800.14(b).  The use of an approved programmatic agreement is appropriate in a number of

circumstances, including "[w]hen effects on historic properties cannot be fully determined prior

to approval of an undertaking" and "[w]here other circumstances warrant a departure from the

normal section 106 process."  *Id.* § 800.14(b)(1)(ii), (v).  Compliance with the procedures set

forth in an approved programmatic agreement satisfies the agency's obligations under NHPA

Section 106.  36 C.F.R. § 800.14(b)(2)(iii).

## II.      Factual and Procedural Background

### A.      Richfield Resources Management Plan and Travel Plan

Prior to the Richfield RMP, the 2.1 million-acre Richfield Planning Area was managed

through a myriad of land use plans and amendments dating back to 1977.  SUPPRICH 2210.

Under the then-existing land use plans, 77% (1,636,400 acres) of the planning area was

designated as "open" to OHV use, thereby allowing OHV users to traverse any portion of the

federal lands (whether or not there were existing routes) without limitation.  SUPPRICH 2199;

*see also* SUPPRICH 405, 600, 7538, 7734.  BLM found that OHV travel on this large amount of

open acreage was resulting in unacceptable damage to resources.  *Id.*  At the time, OHV use also

was allowed on an additional 277,600 acres (13% of the planning areas) on existing routes, and

214,000 acres (10% of the planning area) were closed to OHV users.  SUPPRICH 7889.

In 2001, BLM initiated the planning process for the Richfield Planning Area.  *See* 66 Fed.

Reg. 55,202 (Nov. 1, 2001); *see also* RICH 68674-75.  After eight years of analysis, including

substantial public input, BLM decided to greatly reduce the areas that were available to OHV use

in order to reduce impacts to resources.  The RMP reduced "open" OHV use areas from

1,636,400 acres (77% of the planning area) to 9,890 acres (less than 1% of the area).

SUPPRICH 2212.  In addition, 209,900 acres were "closed" to OHV use, and 1,908,210 acres

were "limited," such that OHV use on those acres could only occur on designated routes.  *Id.*

These "open," "closed," or "limited" area designations were made as part of the RMP.

SUPPRICH 2196.

After designating areas as open, closed, or limited in the RMP, BLM's next step was to designate particular routes for OHV travel in the Travel Plan.  SUPPRICH 2214.  In designating routes, BLM considered impacts to cultural resources as part of its route inventory process in conformance with 43 C.F.R. § 8342.1.  Working with an interdisciplinary team of BLM resource specialists and county representatives, BLM inventoried and mapped 4,622 miles of pre-existing routes within the 2.1 million-acre planning area to serve as a baseline.  SUPPRICH 2214; SUPPRICH 2554; SUPPRICH 8815; *see also* RICH 73519-N – 73687-N.  After an extensive process, BLM found that approximately 345 miles of pre-existing routes had resource conflicts due to the presence of cultural resources, special status species, riparian areas, soils, wilderness values, and non-motorized recreational values, and therefore, in accordance with 43 C.F.R. § 8342.1, BLM decided to close those routes.  SUPPRICH 2214-15.  BLM designated another 538 miles of routes for travel with seasonal closures or width restrictions to minimize resource conflicts.  SUPPRICH 2215, 2288, 2292.  The remaining 3,739 miles were designated as available for OHV use without restriction.  SUPRICH 2215.

### B.    BLM's Compliance with NHPA Section 106

In 1997, BLM entered into a nationwide Programmatic Agreement with the ACHP and the National Conference of State Historic Preservation Officers (attached as Ex. 1).  *See* SUPPRICH 7677.  The Programmatic Agreement (which was revised in 2012) provided that compliance with the agreement would satisfy BLM's obligations under Section 106 and also provided that the SHPOs would develop individual protocols to implement the national agreement.  *See id.*  BLM entered into a State Protocol Agreement (attached as Ex. 2) with the Utah SHPO in 2001, and BLM operated under that protocol in most of Utah until 2014, when it

was replaced by a statewide programmatic agreement.  *See id.*  The State Protocol requires BLM

to undertake reasonable efforts to identify historic properties and to follow the standards in

BLM's 8100 Manual.  *See id.*

BLM's 8100 Manual (attached as Ex. 3) sets forth standards for when and how certain

types of inventories for the identification of historic properties and cultural resources are to be

conducted.  The Manual describes three levels of inventory.  A Class I inventory is an "Existing

Information Survey," which includes a "compilation and analysis of all reasonably available

cultural resource data and literature."  BLM Manual § 8110 ¶ .21A.  A Class II inventory is a

"Probabilistic Field Survey," where a sample field survey is used to make predictions about areas

that are not surveyed.  *Id.* ¶ .21B.  Finally, a Class III inventory is an "Intensive Field Survey"

and is most useful when it is necessary to know precisely what historic properties exist in a

particular area.  *Id.* ¶ .21C.

In order to meet its obligations under the Programmatic Agreement and State Protocol

with respect to the issuance of the Richfield RMP and Travel Plan, BLM relied on two

instruction memoranda ("IM") that it had developed in coordination with the Utah SHPO.  IM

UT 2008-026 (attached as Ex. 4) governs Section 106 consultation for land use planning in Utah

and requires BLM to develop a matrix listing potential actions covered by an RMP and to

indicate to the Utah SHPO whether these actions would have the potential to affect cultural

resources.  The SHPO then has 30 days to review the information submitted by BLM and either

concur or state any objections.

The second guidance document is IM 2007-030, which governs consideration of impacts

to cultural resources, including Section 106 consultation, relating to the designation of routes for

OHV use and implementation of travel plans.[2]  RICH 670.  Under IM 2007-030, BLM

presumptively relies on a Class I inventory when designating pre-existing routes, but it must

conduct additional inventories when new routes are being designated and when cultural

resources are likely to be affected by route designations.  RICH 670-71.  More specifically, BLM

may rely on Class I surveys when route designations "(1) allow continued use of an existing

route; (2) impose new limitations on an existing route; (3) close an open area or travel route; (4)

keep a closed areas closed; or (5) keep an area open."  RICH 671.  However, if "there is a

reasonable expectation that a proposed designation will shift, concentrate or expand travel into

areas where historic properties are likely to be adversely affected," then the guidance requires a

Class III inventory and Section 106 consultation "focused on areas where adverse effects are

likely to occur."  *Id.*

        For the route designations in the Richfield Planning Area, BLM followed the procedures

in IM 2008-026 and 2007-030 to meet its obligations under NHPA Section 106.  For the areas

proposed to be open to cross-country OHV travel, BLM conducted Class III inventories.

SUPPRICH 2230; RICH 6888.  For the designation of routes for OHV travel, BLM conducted a

Class I inventory of all of the historic and cultural resources in the planning area.  SUPPRICH

7673, 7884.  This inventory consisted of reviewing data and information learned from prior

NHPA cultural resource inventories and site excavations that have been conducted on Richfield

Field Office lands for more than thirty years.  *Id.*; RICH 2014983-88 (list of resources

consulted).  In analyzing the results of the inventories, BLM received input from its own cultural

---

[2] IM 2007-030 has since been superseded by IM 2012-67.

resources specialists, reviewed the relevant scientific literature, and consulted with tribal governments and individual tribal members.  SUPPRICH 7884; RICH 2016433-35.

The results of this review and the potential impacts of the actions proposed in the RMP, including travel management, were summarized in the Proposed RMP / Final Environmental Impact Statement ("EIS").  SUPPRICH 7673-79; SUPPRICH 7881-7902; SUPPRICH 8140-51; SUPPRICH 8409.  As explained in the Final EIS, existing inventories show site densities are low across Richfield compared to other areas in the Southwest.  SUPPRICH 7673.  Those sites that do exist along pre-existing routes likely have already been disturbed.  SUPPRICH 7881.  Such impacts are generally "long-term in nature," and once such impacts occur, "the effect typically cannot be reversed."  *Id.*  This makes the potential for new impacts to cultural resources from vehicle use in the areas "low because these areas have been subject to disturbance," and therefore "[c]ontinued use of OHVs would not be expected to cause additional adverse impacts."  SUPPRICH 7893.  With respect to the Proposed RMP, BLM concluded that closing large open areas to OHV use, closing certain routes to protect resources, and designating 4,277 miles of routes would "result[] in less potential for damage to cultural resources in those areas."  SUPPRICH 7896.

After going through this process of compiling and analyzing information regarding cultural resources, BLM consulted with the Utah SHPO and recommended a finding of no adverse effect with respect to OHV use on existing designated routes.  RICH 6877.  Based on preexisting Class III inventories conducted on 216 roads in Wayne County, which revealed the presence of 112 significant sites within the rights of ways, the SHPO expressed concern that on some existing routes, there might be some potential to impact archaeological sites.  *Id.*  To

address the SHPO's concerns, BLM agreed to review the Class III surveys and close or reroute

roads accordingly, to conduct new surveys of previously unsurveyed areas, and implement a

monitoring and mitigation scheme to protect these sites.  *Id.*; RICH 2016439; RICH 2003673-76.

BLM also closed or reduced the size of several areas proposed for cross-country OHV use based

on concerns regarding cultural resources.  SUPPRICH 2230, 7896.  After reviewing the

information provided by BLM, the Utah SHPO concurred with BLM's no adverse effect

recommendation.  SUPPRICH 2412.

  **D.**  **The Court's Rulings**

  The Court issued a ruling on the merits of Plaintiffs' claims relating to the Richfield RMP

and Travel Plan on November 4, 2013 ("Merits Order") (ECF No. 329).  Relevant to this motion,

the Court found that BLM had failed to comply with 43 C.F.R. § 8342.1 in designating routes for

OHV travel.  *Id.* at 10.  The court also found that BLM had violated the NHPA by failing to

make a good faith effort to identify cultural resources and making an unfounded no adverse

effects determination.  *Id.* at 17.  Regarding the NHPA claim, the court stated that it was

remanding "the matter to the BLM to conduct a Class III survey of the designated routes in the

limited OHV use area."  *Id.*  Following additional briefing and discovery relating to remedy, the

Court issued its Remedy Order on May 22, 2015 (ECF No. 388).  In the order, the Court rejected

Defendants request that the Court reconsider its ruling that NHPA Section 106 required BLM to

conduct a Class III inventory of all 4,277 miles of designated routes in the planning area.  *See*

Remedy Order at 7 n.1.  Instead, the court ordered BLM to "perform the Class III inventories

under the NHPA and make new findings regarding adverse effects for all open routes in the

'limited area'" in phases, with the entirety to be completed within three years.  *Id.* at 7-8.

## LEGAL STANDARD

In order to obtain a stay pending appeal, an appellant must meet the following standard:

> For us to consider a request for a stay or an injunction pending appeal, 10th Cir. R. 8.1 requires the applicant to address the following: "(a) the likelihood of success on appeal; (b) the threat of irreparable harm if the stay or injunction is not granted; (c) the absence of harm to opposing parties if the stay or injunction is granted; and (d) any risk of harm to the public interest." In ruling on such a request, this court makes the same inquiry as it would when reviewing a district court's grant or denial of a preliminary injunction.

*O Centro Espirita Beneficente Uniao De Vegetal v. Ashcroft*, 314 F.3d 463, 465 (10th Cir. 2002); *see also Philips v. Okla. Dep't of Corrections*, 79 F. Appx. 380, 382 (10th Cir. 2003).

Similar standards apply when an appeal occurs in the context of a Rule 54(b) motion. Specifically, where a court has entered a judgment on fewer than all of the claims in the lawsuit pursuant to Fed. R. Civ. P. 54(b), a "court may stay the enforcement of a final judgment entered under Rule 54(b) until it enters a later judgment or judgments, and may prescribe terms necessary to secure the benefit of the stayed judgment for the party in whose favor it was entered." Fed. R. Civ. P. 62(h); *see also Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 13 n.3 (1980); *Schieffelin & Co. v. Valley Liquors, Inc.*, 823 F.2d 1064, 1066 (7th Cir. 1987). In considering whether to stay the enforcement of a judgment under Rule 62(h), a court should look to "general equitable principles." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 956 (9th Cir. 2006) (citation omitted).

## ARGUMENT

The Court should stay the requirement to complete the Class III surveys and application of the designation criteria in 43 C.F.R. § 8342.1 pending the outcome of an appeal. *See* Remedy Order at 7-8. A partial stay of the Class III survey requirement is warranted because Defendants

are likely to prevail on the NHPA claim on appeal, BLM is irreparably harmed by the imposition

of a requirement to conduct the inventories, and irreparable harm to cultural resources is not

likely to occur because the BLM will continue to monitor areas where cultural resources may be

affected by OHV use and implement mitigation to prevent harm to such resources.  The

requirement to apply the designation criteria also should be stayed because BLM cannot

complete that process until it completes cultural resources surveys and the Section 106 process.

I.      **Defendants Are Likely to Succeed on the Merits of an Appeal**

Defendants are likely to succeed in arguing on appeal that:  (1) BLM satisfied its

procedural obligations under NHPA Section 106 through compliance with a programmatic

agreement and state protocol agreement, (2) BLM complied with its internal guidance regarding

Section 106 compliance for travel management, and (3) even if BLM had violated Section 106,

the appropriate remedy was a remand to the agency, not to require BLM to conduct Class III

surveys on all 4,277 miles of designated routes in the Richfield Planning Area.

A.      **BLM Complied With the Terms of a State Protocol Regarding Section 106
        Compliance and Obtained the Concurrence of the SHPO**

In complying with Section 106 with regard to the route designations, BLM relied on the

process established through consultation with the ACHP and National Conference of SHPOs, as

set forth in BLM's National Programmatic Agreement, BLM Utah's State Protocol with the

SHPO, and SHPO-approved guidance for implementing the State Protocol.  *See* SUPPRICH

7677-78.  Under those circumstances, "[c]ompliance with the procedures established by an

approved programmatic agreement satisfies the agency's section 106 responsibilities . . . ."  36

C.F.R. § 800.14(b)(2)(iii).  BLM complied with those procedures, and the Utah SHPO concurred

with BLM's no adverse effect finding.  RICH 6877-79; SUPPRICH 2412.  Through that process, BLM met its NHPA Section 106 obligations.

When agencies follow programmatic agreements and obtain concurrence from SHPOs, courts generally view a SHPO's concurrence in an agency's finding as strong evidence of the agency's compliance with the NHPA's consultation process.  *See S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 114 (D.D.C. 2004) (rejecting arguments by SUWA that BLM had violated Section 106 with respect to an oil and gas exploration project, and stating, "Finally, and perhaps most significantly, the BLM has not made a finding of adverse effect, and the Advisory Council and Utah SHPO – even when informed of Dr. Alison's findings – both concurred with the BLM's finding of no adverse effects on historic properties in the project area."); *see also Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 751 F. Supp. 2d 1174, 1182 (D. Kan. 2010) (noting that adverse effects concerns are typically resolved by agreement between an agency and a SHPO and that such agreement would evidence compliance with NHPA § 106), *aff'd*, 684 F.3d 1002 (10th Cir. 2012).

Here, the Court should have given more deference to the Utah SHPO's concurrence in BLM's no adverse effect finding.  *See* Merits Order at 17.  The SHPO concurred in BLM's no adverse effects only after BLM thoroughly considered potential adverse effects and worked with the SHPO to mitigate those adverse effects by agreeing to a mitigation and monitoring scheme. RICH 6877.  Under these circumstances, the SHPO's concurrence in BLM's no adverse effect finding is entitled to deference.  *See Sierra Club v. Clark*, 774 F.2d 1406, 1410 (9th Cir. 1985) ("[T]he fact of actual concurrence by the SHPO in the issuance of the permit, together with imposition of mitigating measures the SHPO requested, satisfied the statutory requirement . . .

."); *W. Alabama Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 683 (S.D. Tex. 2004) (same).  Accordingly, BLM's compliance with the National Programmatic Agreement, as implemented through BLM Utah's State Protocol and BLM's IMs, was legally sufficient to meet the legal requirements of Section 106.  *See* 36 C.F.R. § 800.14(b)(2).

**B.     BLM Complied With Its Internal Guidance Regarding NHPA Section 106 Compliance for Travel Management**

BLM complied with its internal guidance in IM 2007-030 regarding cultural resource surveys and Section 106 compliance applicable to the designation of routes for OHV travel.  IM 2007-030 directed BLM to conduct Class III surveys for the designation of new routes or new areas for OHV travel.  By contrast, it also provided that a Class III inventory was not required for designations that allowed existing routes or areas to remain open or closed existing routes or areas unless "there [was] a reasonable expectation that a proposed designation [would] shift, concentrate or expand travel into areas where historic properties are likely to be affected."  *Id.*

The Court found that the record showed that travel would, in fact, be concentrated on routes where cultural resources would be affected.  *See* Merits Order at 15.  In reaching that conclusion, the Court relied on BLM's statement in the record that "[t]here are undoubtedly roads that go through archaeological sites and sometimes there are site features within the roads that are being damaged.  Continuing use on those roads may be an adverse effect on any sites located therein."  *Id.*  This statement was made in both BLM's June 25, 2008 letter to the Utah SHPO and in response to comment from the Colorado Plateau Archeological Alliance regarding the Proposed RMP.  RICH 6877; RICH 2016647.  BLM did not find, however, that travel will be concentrated on routes where damage to cultural resources may occur.

As BLM went on to explain, it had previously authorized an "intensive cultural resource field inventory of 216 roads in Wayne County" and identified "112 significant sites within the roads rights of way."  RICH 6877.  To address any potential impacts to cultural resources there, BLM then indicated that it would conduct additional analysis, including some "field checking" to see if any cultural resource sites were actually being affected.  *Id.*; RICH 2016433.  BLM also indicated that it would adopt a monitoring system to ensure that the routes identified in Wayne County would not result in impacts to cultural resources.  RICH 6877; RICH 2016433.  For all routes, appropriate mitigation, including road closures and re-routing, would be implemented to avoid such harm.  RICH 6877; RICH 2016433.  BLM would conduct subsequent Class II and Class III surveys on routes on an ongoing basis and prioritized by need.  RICH 2016433.  BLM concluded that "even with the known presence of sites along some of the routes, this action, properly mitigated, would result in no adverse effect."  RICH 6877.  The Utah SHPO concurred in that finding.  SUPPRICH 2412.  Accordingly, the record does not support the conclusion that OHV travel will be concentrated in areas where cultural resources would likely be affected.

The court's NHPA ruling also relied on *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988 (9th Cir. 2013), in which the Ninth Circuit found that BLM had violated the NHPA in designating routes for travel in a national monument.  *See id.* at 1009-10.  That case, however, is readily distinguishable from the claims in this case because:  (1) it involved a national monument and thus a heightened level of protection for monument resources; (2) the plaintiffs introduced specific evidence showing that cultural resources inventories should be conducted in particular areas; (3) it involved the designation of 400 miles of routes – far fewer than the 4,277 miles in the Richfield Planning Area – thus making it more likely that concentrated OHV traffic would

16

occur in the remaining areas; and (4) unlike this case, BLM had not obtained an affirmative concurrence from the SHPO.  *See Montana Wilderness*, 725 F.3d at 1008-10.

> **C.  BLM Should Have Been Permitted to Address the Legal Deficiencies Found by the Court on Remand Rather than Being Required to Conduct Class III Inventories on All 4,277 Miles of Designated Routes**

Even assuming that BLM did not fully comply with its Section 106 obligations, the Court should have remanded the route designations to BLM rather than requiring a specific process on remand.  Plaintiffs' NHPA claims (as well as their other claims) are brought pursuant to the judicial review provisions of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. §§ 701-706.  Under those provisions, when a court finds that an agency action is arbitrary or capricious or otherwise not in accordance with the law, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1226 (10th Cir. 2002).  Therefore, the Court should have remanded to the agency instead of requiring BLM to conduct Class III surveys on all designated routes in planning area.

Further, NHPA Section 106 does not require a 100% Class III inventory of all 4,277 miles of designated routes in the Richfield Planning Area before BLM can approve the Travel Plan.  The regulations require only that BLM make a "reasonable and good faith effort" to identify historic properties.  36 C.F.R. § 800.4(b)(1).  ACHP's guidance provides that federal agencies are not required to undertake a Class III survey in order to comply with the "reasonable and good faith effort" standard.  *See* ACHP's Section 106 Archaeology Guidance, Part C, ¶ 22, available at www.achp.gov/archguide ("A federal agency is not expected to conduct a 100 percent survey of the area of potential affects.  Rather, the identification should be conditioned

by where effects are likely to occur and the likely impact of these effects on listed or eligible sites."). The ACHP's interpretation that 100% Class III surveys are not required is entitled to "great weight." *Nat'l Indian Youth Council v. Andrus*, 501 F. Supp. 649, 678 (D.N.M. 1980), *aff'd sub nom. Nat'l Indian Youth Council v. Watt*, 664 F.2d 220 (10th Cir. 1981).

In addition, BLM's guidance does not require a 100% Class III inventory of all of the miles of designated routes. BLM's manual states that "[t]he most frequently employed method of inventory is [a] class III survey carried out for *specific projects*." BLM Manual § 8110.2.21 (emphasis added). BLM's guidance does not suggest, however, that it is appropriate to conduct a Class III inventory on all of the routes in a planning area. And, in fact, the manual also provides that "[a] Class I inventory is most useful for gaining a comprehensive view of all the known archaeological, historic, cultural, and traditional places *within a large area*, such as the area to be covered by *a land-use plan* or an EIS." *Id.* § 8110.2.21.A.1 (emphasis added). Accordingly, a Class I inventory supplemented by targeted Class III inventories on areas that are open to cross-country OHV use, as was done in this case, is sufficient to comply with Section 106.

## II.     BLM Will Be Irreparably Harmed in the Absence of a Partial Stay

BLM will suffer irreparable harm if the partial stay is not granted. Although the court's ruling was not couched as an affirmative injunction, it effectively enjoined BLM by requiring it to conduct Class III inventories on all routes designated in the Travel Plan. *See Middle Rio Grande Conservancy Dist.*, 294 F.3d at 1225 (referring to an injunction requiring the agency to conduct an EIS on remand). Complying with the court's requirement that BLM conduct Class III inventories on all 4,277 miles of routes in the Richfield Planning Area within three years will impose severe burdens on the agency and irreparably harm BLM in three significant ways.

First, BLM will be harmed by the cost of performing intensive on the ground surveys on 4,277 miles of routes.  A Class III inventory is an extremely detailed and time consuming process.  *See* Thomas Decl. ¶¶ 7-33.  A crew led by an archaeologist must walk the length of the survey route collecting data about any archaeological artifacts and historic properties that they come across.  *Id.* ¶ 14.  Each crew member is assigned to a 15 meter transect.  *Id.*  And because BLM will survey a total width of 60 meters (matching the route designation travel width), four crew members will walk in parallel along each mile of the routes.  *Id.*  This means that to survey 4,277 miles of routes, crew members collectively will walk a total of 17,108 miles.  *Id.* ¶ 35.

As the members of the crew walk their respective transects, they will record archeological artifacts, such as arrowheads and stone tools or historic sites, including historic trash scatters.  *Id.* ¶ 18.  Recording a site may take anywhere from one hour to a week depending on the type and number of artifacts that are found at the site.  *Id.* ¶ 24.  After the recording the sites, the crew must prepare a survey report describing the sites in sufficient detail so that agency officials can determine whether the sites are eligible for listing on the national register and whether they would be adversely affected by the agency's planned actions.  *Id.* ¶¶ 25-26.  These reports are lengthy (a recent report for a 426-mile transmission line was 883 pages and along with associated documentation filled 5 bankers boxes) and may take days, weeks, or months to prepare, depending on the number of sites located.  *Id.* ¶ 28.

In order conduct surveys of such an extraordinary magnitude, BLM must hire one or more outside contractors.  *Id.* ¶¶ 35, 44.  Although no contracts have yet been finalized, BLM estimates that it will cost roughly $2.9 million to pay contractors to do the required survey work.  *Id.* ¶ 47.  By contrast, BLM Utah's cultural resources budget for the next three years is roughly

$3.9 million.  *Id.* ¶ 51.  Because the costs of the surveys would be such a high percentage of

BLM Utah's entire cultural resources budget, BLM's national office expects to contribute

roughly $1.7 million to the surveys.  ("Tupper Decl.") ¶ 7.  BLM will never recoup the millions

of dollars that it must spend to conduct the surveys, and therefore the harm will be irreparable.

*See Philip Morris USA, Inc. v. Scott*, 131 S. Ct. 1, 4 (2010).

Second, even if contractors do the initial fieldwork and prepare the report, BLM

personnel must still devote substantial time to the surveys and to the NHPA Section 106 process.

Thomas Decl. ¶¶ 29, 31-33, 37.  A BLM field manager must review and approve the reports,

which may take weeks or months given the size of the reports that would be generated.  *Id.* ¶¶

29, 33.  If adverse effects are identified in the report, the field manager must consult with the

SHPO, which will take a similar amount of time for review and may not accept it.  *Id.*  If that

occurs, BLM must revise the report and send it to the SHPO for further review.  *Id.*  This process

may take months.  *Id.* ¶ 33.  The requirement to conduct the surveys will require years of

manpower and overwhelm BLM and the SHPO.  *Id.* ¶¶ 34-42.

Due to the fact that a substantial portion of BLM's budget and a significant amount of

BLM staff time will be devoted to completing the surveys and the Section 106 process, BLM

will need to divert funds and staff from other important programs and tasks to protect cultural

resources in Utah.  *Id.* ¶ 39-42.  BLM Utah's $1.3 million annual budget for cultural resources is

used to manage and protect archaeological, paleontological, and historic resources.  *Id.* ¶ 51.

Specifically, the funds are used, among other things, for advertising campaigns designed to

prevent looting and vandalism, installation of road signs and barriers, conducting law

enforcement patrols, and stabilizing archaeological sites.  *Id.* ¶ 42, 52.  Funds may also be

diverted from other programs in Utah, thus delaying the necessary cultural resources reviews and Section 106 processes for a variety of activities, including recreation, grazing, and mining. *Id.* ¶¶ 39-41. At the national level, BLM will have to trim its budget for cultural and paleontological resources and tribal consultation by 4%. Tupper Decl. ¶ 7. This will result in reduced funding for a variety of programs, cultural site and fossil inventories on National Conservation Lands and the Arctic Coastal Erosion Survey in Alaska. *Id.* ¶ 8.

## III. Plaintiffs' Interest in Protecting Cultural Resources Will Not Be Harmed if a Partial Stay is Granted

There is no evidence to suggest that harm to cultural resources would occur if the Court's NHPA rulings were partially stayed. BLM has already closed and restricted routes where harm to cultural resources might occur, and with the concurrence of the Utah SHPO identified additional routes for monitoring and potential mitigation. RICH 6877; SUPPRICH 2230, 2412, 7896. Although some unsurveyed sites will be damaged by continued OHV use, the risks of this occurring are low because existing inventories show site densities are low across Richfield and existing sites likely have already been impacted with irreversible effects. SUPPRICH 7673; SUPPRICH 7881; SUPPRICH 7893. BLM will continue to conduct targeted Class III surveys in areas where there is a high potential for harm to cultural resources and use mitigation, such as re-routing or closures to prevent any such harm. RICH 6877; Thomas Decl. ¶ 65.

## IV. The Public Interest Weighs in Favor of a Partial Stay

A partial stay of the court's Remedy Order is in the public interest. Requiring Class III inventories on all 4,277 miles of designated routes in an area where site densities are low and there is no evidence that allowing continued OHV use on those roads will actually impact any cultural resources is of little value. *See* SUPPRICH7673; SUPPRICH 7881; SUPPRICH7893.

Further, BLM would be required to carefully survey and record these sites regardless of whether they contained valuable archaeological artifacts or historic trash, such as piles of tin cans.  *See* Thomas Decl. ¶¶ 18, 20.  Spending the time and money to conduct such surveys would not be in the public interest.  *Id.* ¶ 21.  Moreover, because BLM cannot complete the route evaluation process applying the designation criteria until it has completed its surveys of cultural resources, the requirement to complete the Class III surveys  will delay the completion of the route evaluation process in accordance with 43 C.F.R. § 8342.1 on remand by up to several years. Thomas Decl. ¶ 64.

## CONCLUSION

Accordingly, Defendants respectfully request that the Court partially stay its Remedy Order pending an appeal, such that the requirements to complete a route evaluation process for the Richfield Planning Area applying the designation criteria in 43 C.F.R. 8342.1 and to conduct Class III cultural resource inventories on all of the designated routes in the Richfield Planning Area within a three year period are stayed.

Respectfully submitted this 21st day of September, 2015,

JOHN W. HUBER
United States Attorney

JARED C. BENNETT
Assistant United States Attorney (#9097)
185 South State Street #300
Salt Lake City, Utah 84111
tel: (801) 325-3259; fax: (801) 325-3261
jared.bennett@usdoj.gov

JOHN C. CRUDEN
Assistant Attorney General

*/s/ Luther L. Hajek*

22

LUTHER L. HAJEK (*pro hac vice*)
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
tel: (303) 844-1376; fax: (303) 844-1350
luke.hajek@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2015, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of this filing to all

counsel of record.

/s/ *Luther L. Hajek*
Luther L. Hajek
Trial Attorney
U.S. Department of Justice